556 F.2d 132
 Gilbert PARKS et al., Appellants,
v.
"MR. FORD" d/b/a Ford's Speed Shop et al.
William MULDOWNEY, Jr., on behalf of himself and all others
similarly situated, Appellant,
v.
INTERNATIONAL CYCLES, INC.
 No. 75-2271.
 United States Court of Appeals,
Third Circuit.
 Argued May 6, 1976.
Reargued Nov. 4, 1976.
Decided April 4, 1977.
 
 David A. Scholl, Delaware County Legal Assistance Ass'n, Inc., Chester, Pa., for appellants.
 Donald J. Martin, George W. Helme, IV, Thomas E. Waters, Jr., Waters, Fleer, Cooper & Gallager, Norristown, Pa., for appellee, North Penn Motors, Inc.
 H. Kenneth Tull, Philadelphia, Pa., for appellee, Erwin Chevrolet, Inc.
 Before ALDISERT, GIBBONS and GARTH, Circuit Judges.
 Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 This appeal concerns the validity under the due process clause of the Fourteenth Amendment of two aspects of Pennsylvania law: first, a common law rule which gives automobile repairmen a possessory lien on vehicles they have repaired, and second, statutes which permit repairmen to sell vehicles retained under that lien. The district court held that state action is not involved when private repairmen retain or sell vehicles pursuant to these laws. It therefore granted summary judgment in favor of the defendants (private garages and repairmen) and against the plaintiffs, who are aggrieved car owners. We have concluded that the district court was correct in holding that mere retention of the vehicles by the defendants did not involve state action but that the district court erred in reaching the same result with respect to a vehicle which, under Pennsylvania's statutes, could have been sold by one of the defendants. In this latter instance, we have also concluded that the Pennsylvania statutes authorizing such a sale violate due process.
 
 I.
 
 2
 Pennsylvania common law gives a repairman a lien on those items which he repairs and permits him to retain possession of them until payment is made for the work performed. Wilson v. Malenock, 128 Pa.Super. 544, 194 A. 508 (1937). Pennsylvania statutes permit a repairman whose bill is not paid to sell those items retained under his common law lien in order to satisfy the amount of the lien. Pa.Stat.Ann. tit. 6, §§ 11-14 (1963).[1]
 
 
 3
 The five plaintiffs in this case are Pennsylvania residents whose motor vehicles were retained by private repairmen when the plaintiffs refused to pay the amounts which the repairmen claimed that they owed for repairs. One of the plaintiffs, Gilbert Parks, eventually paid the amount demanded and regained possession of his automobile. Another, Lewis Williams, regained possession of his vehicle through agreement of counsel after this action was initiated. That car is no longer in Williams's possession. Two of the plaintiffs, Hattie Ellerbe and William Muldowney, Jr., never regained possession of their vehicles but have now abandoned them as worthless. These four plaintiffs have live claims under 42 U.S.C. § 1983 (1974)[2] based on the allegedly unconstitutional retention of their vehicles by particular defendants. They maintain that the repairmen who retained their vehicles acted "under color of" Pennsylvania law and that the repairmen's conduct violated their due process rights under the Fourteenth Amendment.
 
 
 4
 The fifth plaintiff, Lois Dillon, regained possession of her automobile under a court order "pending the final disposition" of this case.[3] Since the garage's lien on her vehicle apparently was not extinguished under Pennsylvania law when the garage surrendered possession in compliance with the court order, Bernstein v. Hineman, 86 Pa.Super. 198, 201 (1925), Pennsylvania law would permit the garage, should it ever regain possession of the Dillon car, to sell it in satisfaction of its lien. Dillon, therefore, has a present claim for relief enjoining the sale of her car by the lienholder, as well as a claim for damages based on the retention of her car pursuant to the lien. In asserting these claims, Dillon argues that a private repairman who retains or sells his customer's car acts "under color of" Pennsylvania law and that the provisions which permit him to do so do not comport with due process requirements.
 
 
 5
 The district court concluded that neither the retention nor the sale of a customer's car by a private repairman was action "under color of" Pennsylvania law, and it therefore granted summary judgment in favor of the defendants and against each of the plaintiffs. Parks v. "Mr. Ford", 386 F.Supp. 1251 (E.D.Pa.1975). This appeal followed.[4]
 
 II.
 
 6
 We are not persuaded that the retention of plaintiffs' vehicles by the defendants pursuant to Pennsylvania's common law garageman's lien constitutes action "under color of" state law as required by 42 U.S.C. § 1983.[5]
 
 
 7
 In Magill v. Avonworth Baseball Conference, 516 F.2d 1328, 1330-31 (3d Cir. 1975), this Court identified three general categories of state action cases: "(1) where state courts enforced an agreement affecting private parties; (2) where the state 'significantly' involved itself with the private party; and (3) where there was private performance of a government function." See also Hollenbaugh v. Carnegie Free Library, 545 F.2d 382, 383 (3d Cir. 1976). Cf. Jackson v. Metropolitan Edison Co., 483 F.2d 754, 757 (3d Cir. 1973), aff'd 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1975). Retention[6] of the plaintiffs' vehicles by the defendants does not fall within any of these three groups.
 
 A.
 
 8
 It is evident that we are not here concerned with a case in which "state courts enforced an agreement affecting private parties," since the defendants never invoked the assistance of the state courts to enforce their liens.6a Compare Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) (state court judgment for damages for violation of racially restrictive covenant is state action); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (state court injunction to enforce racially restrictive covenant is state action). See also Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970) (no state action where state court refused to use doctrine of cy pres to excise racial restriction from trust but held instead that trust had failed and reverted to heirs of settlor).
 
 B.
 
 9
 Nor are we persuaded that this is a case in which "the state (has) 'significantly' involved itself with the private party." Pennsylvania has neither compelled nor coerced the defendants to retain possession of the plaintiffs' vehicles. Compare Adickes v. S. H. Kress & Co., 398 U.S. 144, 172, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1969) (dicta that action pursuant to custom having the "force of law" would be state action); Robinson v. Florida, 378 U.S. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964) (manager's request that integrated group leave restaurant was state action where state regulations put special burdens on facilities serving both races); Lombard v. Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963) (manager's request that integrated group leave restaurant was state action where state officials commanded or coerced him to do so); Peterson v. Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963) (manager's request that blacks leave restaurant was state action where integrated facilities were forbidden by ordinance).
 
 
 10
 None of the defendants was "a willful participant in joint activity with the State or its agents." Compare United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966) (state action where private individuals conspired with state officers to murder civil rights workers). In fact, state officials did not even perform ministerial functions in connection with the defendants' retention of the plaintiffs' vehicles. Compare North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975) (court clerk issued writ of replevin); Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (judge ordered issuance of writ of sequestration); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (court clerk issued writ of replevin); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (court clerk issued summons of garnishment); Kacher v. Pittsburgh National Bank, 545 F.2d 842 (3d Cir. 1976) (involving Pennsylvania replevin procedures declared unconstitutional in Fuentes ). The state is not in a "position of interdependence" or a "symbiotic relationship" with the garagemen, since it did not and could not derive any benefit from their decision to retain plaintiffs' vehicles. Compare Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). See Jackson v. Metropolitan Edison Co., 419 U.S. 345, 357-59, 95 S.Ct. 449, 42 L.Ed.2d 477 (1975); Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 174-77, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Cf. Braden v. University of Pittsburgh, 552 F.2d 948 (3d Cir. 1977) (denial of University's motion to dismiss for want of state action was correct).6b
 
 
 11
 Contrary to the plaintiffs' suggestion, we are not convinced that this case is comparable to Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), or Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969). In Reitman, the Supreme Court held that California had become involved in the discriminatory acts of private individuals when it enacted a constitutional amendment which not only repealed existing open housing legislation but also prohibited the governor, the legislature, and all agencies and subdivisions of the state from limiting in any way the right of private individuals to discriminate in the sale or rental of real property. See Black, Foreward: "State Action," Equal Protection, and California's Proposition 14, 81 Harv.L.Rev. 69, 75 (1967). In Hunter, the Supreme Court reached a similar result where, after the Akron, Ohio, city council had enacted an open housing ordinance, the voters amended the city charter to require any such ordinance to be approved by referendum.
 
 
 12
 Reitman and Hunter are readily distinguishable from the instant case. The private activity with which we are here concerned does not involve racial discrimination and therefore, like many of our sister circuits, we do not find the analysis in Reitman and Hunter controlling. Anastasia v. Cosmopolitan National Bank of Chicago, 527 F.2d 150, 155 (7th Cir. 1975) (hotelkeeper's lien); Turner v. Impala Motors, 503 F.2d 607, 611 (6th Cir. 1975) (self-help repossession of automobiles); Fletcher v. Rhode Island Trust National Bank, 496 F.2d 927, 931 (1st Cir. 1974) (banker's right to set-off customer's debts against customer's deposits); James v. Pinnix, 495 F.2d 206, 208-09 (5th Cir. 1974) (self-help repossession of automobiles); Shirley v. State National Bank of Connecticut, 493 F.2d 739, 744-45 (2d Cir. 1974) (self-help repossession of automobiles) (2d Cir. 1974); Adams v. Southern California First National Bank, 492 F.2d 324, 333 (9th Cir. 1974) (self-help repossession of automobiles). To paraphrase the First Circuit's words in Fletcher, "We question if a case forged from the nation's continuing struggle with the cancer of racial discrimination can in every particular be transferred to one dealing with" garagemen's liens.[7] Further, Reitman and Hunter involved governmental actions which sought to shield private racial discrimination from legislative or administrative redress. Here, the lien in question is subject to repeal or modification by the ordinary legislative or judicial processes.
 
 C.
 
 13
 Neither are we convinced that this is a case involving "the exercise by a private entity of powers traditionally exclusively reserved to the State" or "traditionally associated with sovereignty." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352-53, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1975). Plaintiffs argue that the retention of their cars by the defendants constitutes state action because the Commonwealth delegated to the garagemen a part of its sovereign power with respect to "conflict resolution." Brief for Appellants at 15. They explain:
 
 
 14
 This is the power to determine ex parte precisely what amount is owed, and to utilize a summary attachment and execution procedure to enforce this determination. It is submitted that the law and statutory scheme challenged, then, places the power of the state behind the repairman and render his conduct 'state action' within the meaning of that term in the fourteenth amendment.
 
 
 15
 Id. at 17.
 
 
 16
 We considered and rejected a virtually identical argument in Gibbs v. Titelman, 502 F.2d 1107 (3d Cir. 1974), cert. denied sub nom. Gibbs v. Garver, 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974), in which we held that self-help repossession of automobiles under §§ 9-503, 9-504 of the Uniform Commercial Code did not involve state action. In Gibbs the district court had held that there was state action because the state had delegated to the repossessors its sovereign "power to decide that your rights are greater than another's." Gibbs v. Titelman, 369 F.Supp. 38, 48 (E.D.Pa.1973). "This power," it wrote, "has no less an impact on the person whose goods are taken when the state does not compel that the power be used." Id. We rejected that argument out of hand. 502 F.2d at 1107, 1114. Faced with a strikingly similar argument in Davis v. Richmond, 512 F.2d 201, 204-05 (1st Cir. 1975) (retention of property pursuant to boardinghouse keeper's lien not state action) the First Circuit reached the same result:
 
 
 17
 Plaintiff's 'public function' argument boils down to an assertion that it is inherently a governmental responsibility to resolve disputes before permitting any deprivation of property. But as already suggested, in either a state of nature or an organized society without an applicable law, a boardinghouse keeper might reasonably assert the right to hold a guest's property within the premises until the rent is paid. A keeper does not need assistance from the state to take and hold property within the premises: self-help is readily available. We said in Fletcher, supra, 496 F.2d at 930.
 
 
 18
 'Whatever the truth of the old saw that possession is nine-tenths of the law, a creditor who holds something of value to his debtor is differently situated from one who does not: he does not need the state to facilitate his collection efforts.'
 
 
 19
 (Footnotes omitted.)
 
 
 20
 We believe that Gibbs and Davis correctly dispose of plaintiffs' argument. Initially, as in Gibbs, supra, at 1114, we believe that the ancient origin of the challenged activity is highly relevant. While we acknowledge that state action issues ought not to turn solely upon whether the right asserted has common law origins,[8] when private individuals engaged in a particular activity long before the enactment of the Fourteenth Amendment, that circumstance is strong evidence that the activity in question is not one "traditionally exclusively reserved to the State."[9] Anastasia v. Cosmopolitan National Bank of Chicago, supra, at 156; Barrera v. Security Building & Investment Corp., 519 F.2d 1166, 1172 (5th Cir. 1975); Gibbs v. Titelman, supra, at 1114; Shirley v. State National Bank of Connecticut, supra, at 745; Adams v. Southern California National Bank, supra, at 337.
 
 
 21
 In this case, it is clear that Pennsylvania recognized an artisan's lien on property he had repaired or improved long before 1868. In McIntyre v. Carver, 2 Watts. & Serg. 392, 37 Am.Dec. 519 (Pa.1841), the Pennsylvania Supreme Court held that a carpenter to whom doors were delivered to be finished had a common-law lien which attached to them for the value of his labor. The court wrote: "It is not to be doubted that the law of particular or specific lien on goods in the hands of a tradesman or artisan for the price of work done on them, though there is no trace of its recognition in our books, was brought hither by our ancestors; and that it is part of our common law." Id. at 395.
 
 
 22
 Finally, even if the antiquity of Pennsylvania's garagemen's lien is not considered, we simply are not satisfied that a garageman exercises a power traditionally reserved exclusively for the sovereign when he refuses to release his customer's vehicle until he is paid. The contrast between the situation here and the situation in which the Supreme Court has found state action because sovereign powers were delegated is striking. Unlike the power of eminent domain, Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 353, 95 S.Ct. 449 (dicta), the power to control the electoral process, Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932), Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), the power to regulate activities permitted in the streets, Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946),[10] or the power to regulate access to public parks, Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), a garageman's "power" or right to retain the cars of customers who have not paid their bills is an essential attribute of possession, not of sovereignty.
 
 D.
 
 23
 In sum, we have determined that private action pursuant to the Pennsylvania garagemen's lien is not "state action" or action "under color of" state law, since it does not fall within any of the three categories of state action identified in Magill v. Avonworth Baseball Conference, supra.10a Accord, Phillips v. Money, 503 F.2d 990 (7th Cir. 1974) (private action under Indiana garagemen's lien not state action).[11]
 
 III.
 
 24
 Plaintiff Dillon's claim for injunctive relief against the sale of her automobile pursuant to Pa.Stat.Ann. tit. 6, §§ 11-14 (1963) stands on an entirely different footing. The Commonwealth's statutory scheme may be briefly summarized as follows. A garageman who retains a vehicle under his common law lien may sell the vehicle if his bill is not paid within thirty days after he has properly notified the owner of the amount due. Pa.Stat.Ann. tit. 6, § 11 (1963). The notice must be written and must contain a verified and itemized statement of the services performed. Pa.Stat.Ann. tit. 6, §§ 11-12 (1963). If the owner does not pay the bill or cause a writ of replevin to be issued within thirty days after receiving the garageman's notice, the garageman may proceed with the sale "in the same manner as personal property is sold by a sheriff or constable." Pa.Stat.Ann. tit. 6, § 12 (1963). The sale is "as conclusive to the title conveyed as if sold by a sheriff or constable." Pa.Stat.Ann. tit. 6, § 14 (1963). After satisfying the amount of the lien and his own costs, the garageman must pay the remainder to the owner upon demand or, if the owner does not demand those funds, to the county treasurer. Pa.Stat.Ann. tit. 6, § 13 (1963).
 
 
 25
 In contrast to our view that state action is not present when a vehicle is retained under the common law lien, we believe that state action is present when a garageman sells a customer's vehicle under the statutory scheme just described. First, the garageman's power to sell property retained under his common law lien, unlike the lien itself, was not authorized prior to the enactment of the statute in 1925[12] and arises solely from that legislation. Pub.L. No. 557, § 1 (May 7, 1925). The statute not only extended the power of sale to the garageman but also directed him to follow the same procedures employed by a sheriff or constable. In addition, the statute decreed that the effect of the sale was to be as conclusive as that of a sheriff or constable. By thus authorizing sales to take place, directing how they are to be carried out, and giving them the effect of judicial sales, Pennsylvania has quite literally delegated to private individuals, powers "traditionally exclusively reserved" to sheriffs and constables. In our view, that grant of power has the same effect for state action purposes as if Pennsylvania had endowed private individuals with the same authority to arrest suspects and to execute warrants as state and local police possess. Cf. Griffin v. Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964). As a result, we have no doubt that state action exists when a garageman sells a customer's vehicle pursuant to Pa.Stat.Ann. tit. 6, §§ 11-14.
 
 
 26
 In holding that state action is inherent in sales conducted under the Pennsylvania statutory scheme, we do not rely at all upon the fact that state employees in the Bureau of Motor Vehicles, upon receipt of a proper application from a garageman who has foreclosed on his lien, issue a certificate of title for the vehicle in the garageman's name. We recognize that garagemen would be effectively prevented from foreclosing on their liens if state employees did not perform this service. See Pa.Stat.Ann. tit. 75, § 201(a) (1971). But we adhere to our holding in Gibbs that this minor involvement by state officials is not sufficient to transform essentially private transactions into state action. 502 F.2d at 1113 n. 17. The purpose for the Commonwealth's participation is "to protect innocent purchasers of motor vehicles, to protect the public by affording identification of vehicles and to keep records current." Shirley v. State National Bank of Connecticut, supra, at 743 n. 5. If the role played by state employees in issuing new certificates of title to garagemen who foreclose on their liens were enough to infuse those foreclosures with state action, then obviously there would be state action as well whenever a new or used car is purchased and a new certificate of title is issued. By the same logic, the service which state employees perform in recording deeds and mortgages would seem to inject state action into virtually every real estate transaction. Id.; Burke & Reber, supra, at 19-23. We do not believe that any of these essentially private transactions, which number in the millions each year, may be said to constitute state action simply because state employees participate in the negligible role of record-keepers.
 
 
 27
 Because we have determined that state action is present when a private repairman sells a customer's vehicle pursuant to Pennsylvania's statutes, those statutes must be measured against Fourteenth Amendment due process standards. Since such a determination involves no questions of fact and since a determination that due process was satisfied would constitute a basis upon which the district court's grant of summary judgment could be affirmed,[13] we turn to that question.
 
 IV.
 
 28
 We believe that the Pennsylvania statutes under which a repairman may sell a customer's motor vehicle to satisfy his common-law lien, Pa.Stat.Ann. tit. 6, §§ 11-14 (1963), do not meet the due process requirements articulated by the Supreme Court. See North Georgia Finishing, Inc. v. Di-Chem, Inc.,419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); Fuentes v. Shevin,407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). See also this Court's analysis of these precedents in Jonnet v. Dollar Savings Bank of the City of New York, 530 F.2d 1123 (3d Cir. 1976).
 
 
 29
 It is not an easy task to extract clear rules from the Supreme Court cases cited above. The current status of Fuentes is unclear in light of North Georgia Finishing, Inc. v. Di-Chem, Inc., supra, and Mitchell v. W. T. Grant, supra. However, even if we were to ignore Fuentes, it seems evident that the Pennsylvania statutes at issue in this case do not pass muster when tested by the due process standards expressed in the Supreme Court's two most recent cases: Mitchell v. W. T. Grant Co., supra, and North Georgia Finishing, Inc. v. Di-Chem, supra.
 
 
 30
 In Mitchell, the Supreme Court approved Louisiana's sequestration procedures, which "(1) required a creditor to file an affidavit stating 'specific facts' entitling him to sequestration; (2) mandated that the writ was issuable only by a judge; (3) required the creditor to file a bond to protect the debtor from all damages in the event the sequestration was shown to have been wrongful; (4) entitled the debtor to dissolve the sequestration by filing his own bond; and (5) entitled the debtor to an immediate hearing after seizure and to dissolution of the writ absent proof by the creditor of the grounds on which the writ was issued." (Footnote omitted).[14]
 
 
 31
 In North Georgia Finishing, Inc., the Court held that Georgia's prejudgment garnishment procedures were constitutionally insufficient because "(1) they allowed a writ of garnishment to issue on affidavit by a creditor or his attorney containing only conclusory allegations; (2) the writ was issuable by the court clerk without participation by a judge; (3) the garnishment could be dissolved only by the filing of a bond, which continued to deprive defendant of the use of some property; and (4) there was no provision for an early hearing at which the creditor would be required to demonstrate at least probable cause for the garnishment."[15]
 
 
 32
 The Pennsylvania statutes challenged here display few of the "saving characteristics"[16] of the provisions sustained in Mitchell and exhibit many of the objectionable characteristics of the provisions struck down in North Georgia Finishing, Inc. Under the statutes at issue in this case, a garageman who wishes to sell a customer's vehicle must serve the owner with written notice and a verified, itemized statement of the services performed and the amount demanded. However, once the notice has been served and thirty days have elapsed, he may proceed with the sale without first obtaining judicial authorization, without filing a bond, and without providing a hearing at which the customer has the opportunity to challenge the amount charged and due.
 
 
 33
 A vehicle owner, on the other hand, can prevent a threatened sale only by initiating an action in replevin and posting a replevin bond. If the owner cannot post the bond or if he does not commence an action in replevin for any other reason, he is not afforded a hearing before the sale occurs.
 
 
 34
 Moreover, the statutes challenged here have other serious flaws. Unlike the prejudgment garnishment statutes struck down in North Georgia Finishing, Inc. and Sniadach or the sequestration procedures approved in Mitchell, the statutes at issue here result in a permanent, not a temporary, deprivation of property. This factor standing alone is particularly significant, since (1) the garageman need not file a bond to protect the vehicle owner, (2) the vehicle will typically be sold for a price well below its market value, and (3) any vehicle, no matter how valuable, may be sold to satisfy any repairman's lien, no matter how small. When all these factors are considered, it is plain that these statutes violate Fourteenth Amendment due process.[17] As a consequence, defendant North Penn Motors, Inc., which continues to hold a common-law lien on plaintiff Dillon's car, must be enjoined from selling her automobile pursuant to those statutes.
 
 V.
 
 35
 We therefore will affirm the district court's order insofar as it grants summary judgment against the four plaintiffs whose claims arise solely from the retention of their vehicles. We will reverse the district court's order insofar as it grants summary judgment against the one plaintiff, Lois Dillon, whose claims implicate the Commonwealth's sale statutes and remand to the district court for proceedings consistent with this opinion.
 
 ADAMS, Circuit Judge, concurring:
 
 36
 I concur in the result reached by Judge Garth and also with his opinion insofar as it relates to the foreclosure sale provision. With respect to the possessory lien, I agree that the grant of summary judgment for the defendants was not erroneous. This is so because in my judgment it has not been established, at least in this case, that the common law retention mechanism is repugnant to the requirements of the due process clause of the fourteenth amendment.[1]
 
 
 37
 Since these conclusions would be sufficient to dispose of the case without delving into the problem whether the possessory lien implicates state action, I ordinarily would not write separately. State action questions, however, form a fundamental element of much important litigation before this Court. Thus, in view of the fact that I am unable to subscribe to the state action analysis regarding the possessory lien set forth by the plurality I find it appropriate to record the following comments.
 
 
 38
 Resolving the question whether ostensibly private conduct, such as retention of personal property by repairmen, should be deemed "state action" and thus subject to the panoply of constitutional restraints is a perplexing task. The difficulties posed by the inquiry are amplified by the fact that the Supreme Court has not as yet formulated a unitary theory of state action. Rather, it has delineated a set of categories for assessing the wide variety of factual patterns that concern conduct claimed to be performed under color of state law.[2]
 
 
 39
 It would appear that the rubric that is most apposite to this case is that of "public function." On a number of occasions, the Supreme Court has indicated that purportedly private activity will be deemed to be the exercise of a public function if the conduct in question is one "which is traditionally associated with sovereignty."[3]
 
 
 40
 Public function cases may not, at first glance, appear to embody instances of state action since the state itself is not performing the disputed conduct. The Supreme Court, however, has indicated that the identity of the actor is not dispositive for the purposes of state action. If the type of activity involved is governmental in nature, it will be deemed state action whether performed by a public employee or a private person.[4]
 
 
 41
 Both Judge Garth and Judge Hunter seem to agree that the critical aspect of the state action inquiry in this case is whether a public function is present,[5] but they appear to conclude that retention of a vehicle pursuant to a common law garageman's lien cannot be so characterized. Several interrelated rationales appear to undergird their position. Judge Garth and Judge Hunter reject the contention that since the garageman's lien is, at least in part, a device for conflict resolution, it must be considered to be the exercise of a delegated public function. Support for this approach, they claim, is found in this Court's opinion in Gibbs v. Titelman.[6] Moreover, both Judge Garth and Judge Hunter maintain, although with varying degrees of intensity, that the ancient lineage of the lien is relevant to the public function analysis.[7] Since the lien has hoary antecedents, they urge that detention of property pursuant to such a lien is not a power "traditionally, exclusively reserved to the state." Finally, Judge Garth asserts that the retention of vehicles belonging to customers who have not paid their bills is not an activity connected with any attribute of sovereignty; instead, he declares, it is an attribute of possession. To buttress this contention, the plurality invokes the rationale adopted by the First Circuit in Davis v. Richmond[8] in determining that detention pursuant to a boardinghouse lien was not state action.[9] The First Circuit stated that the exercise of such a lien is not a public function since the lienholder could, "in a state of nature," reasonably detain the property, and with the advent of organized society would still not need the assistance of the state in so acting.[10]
 
 
 42
 The difficulty with the propositions advanced by Judges Garth and Hunter begins with the decision to concentrate upon the particular conduct involved, i. e. detainer pursuant to a common law lien, as distinguished from the broader generic category of resolution of conflicts.[11] The approach of focusing on the particular activity in question, it would seem, has two flaws. First, it tends to obscure the inquiry that illuminates the intellectual justification of the public function rule: namely, whether the type of activity involved is ordinarily associated with the state, thus requiring that its exercise be subjected to constitutional limitations.
 
 
 43
 Second, and perhaps more important, the emphasis on the specific conduct has led Judge Garth and Judge Hunter to stress the antiquity of the possessory lien as a key element of the public function discussion. Their point appears to be that, since the common law detainer right is a venerable tool employed in private conflict resolution, it cannot be said to be a traditional function of the sovereign. Thus, the reasoning goes, the use of such a lien does not constitute state action.
 
 
 44
 The possessory lien here is, of course, an historic one whose origin predates the passage of the fourteenth amendment. Unlike Judge Garth and Judge Hunter, however, I believe that such a consideration should not be controlling for the purposes of the state action question. That a practice existed prior to 1867 should not, standing alone, be sufficient to insulate it from constitutional scrutiny. The inescapable fact is that promulgation of the fourteenth amendment substantially changed the legal landscape, and requires that once-sacrosanct customs be examined anew.[12]
 
 
 45
 Moreover, the origins of the lien asserted by a repairman, origins that are concededly private, would not appear to be dispositive of the public function-state action question. The command of the fourteenth amendment that only state action be subject to constitutional restraints is, of course, immutable, but the content of "state action" is flexible. Indeed, the notion as to which activities are governmental in character is, and in a dynamic society ought to be, evolutionary in nature.[13] This is so if the Constitution is to serve the body politic in a salutary fashion.
 
 
 46
 Thus though it may well be that detention of property pursuant to a repairman's lien was viewed in medieval England as a purely private mode of resolving conflicts, such is not the case today. The conception of the state and its role in ordering social relationships has been significantly altered since the Middle Ages, as have ideas about the locus of power to adjudicate disputes. Conflict resolution is now seen as one of the core attributes of the sovereign.[14] It would seem to follow that any person or entity that has the power unilaterally to resolve a controversy whether under color of common law or statute, is a delegate of an essentially governmental activity.
 
 
 47
 For similar reasons, it would appear that the analysis set forth in Davis v. Richmond,[15] which has been adopted by the plurality, misses the mark as well. It is respectfully suggested that the relevant question is not, as Davis indicates, what was the legal status of retention pursuant to an artisan's lien in the "state of nature." Rather, the pertinent inquiry is how the practice fits in with modern conceptions of the state, and particularly with the idea of the state as viewed from the vantage point of the fourteenth amendment.
 
 
 48
 In addition, I cannot share the view of the Davis Court that the state is not at all implicated in the retention of personal property pursuant to a common law lien. Every time a case dealing with an artisan's lien has come before the courts of Pennsylvania and every time these courts have placed their imprimatur on that practice, the state, as a practical matter, has lent its aid to the detainer of another person's property. If the retention were accomplished pursuant to a state statute, it would not be disputed that the state had rendered some assistance, at the very least, to the artisan. To suggest that our attitude should be different when the same activity finds its warrant in the common law would be tantamount to resurrecting the notion that common law is less a part of the law of a state than statutory enactments, a construct that has been uniformly rejected at least since Erie R. R. v. Tompkins.[16]
 
 
 49
 My point is not that the implication of the state in the garagemen's lien is dispositive of the state action inquiry, for such an approach would surely dissolve the limitations on the applicability of constitutional restraints that are inherent in the state action concept. Rather, the point is that it cannot fairly be asserted that the state stands wholly apart from that activity and that common law liens are automatically removed from the ambit of state action.
 
 
 50
 These considerations would seem to suggest that the possessory lien, whether or not its ancestry can be traced to the common law, is state action. By virtue of the possessory lien the artisan has an important, albeit not conclusive, weapon in resolving disputes with owners regarding the authorization for and cost of certain repairs. This mechanism relieves the repairman of having to take the initial step into court.[17] Instead, it allows him to act on the temporary assumption that he will prevail on the merits of his claim, and then requires the owner to resort to the authorities. In addition, the lien permits the repairman to transform a limited bailment of property into a nonconsensual and potentially open-ended deprivation of the rights of the owner to his vehicle. The ability ex parte to effect such determinations of controversies between repairmen and owners, even though interim in nature, would appear to be part of the sovereign's power to resolve conflicts.[18]
 
 
 51
 A comparison between this case and prior precedents concerning creditors' remedies, in which the courts have assumed the existence of state action and proceeded to find due process violations, would seem to support the proposition that state action is present here. In Fuentes v. Shevin,[19] for example, a creditor, after a dispute had arisen over the final payments of a consumer loan, had certain chattels seized by a sheriff pursuant to a writ of replevin. And in Sniadach v. Family Finance Corp.,[20] a creditor, through a court action, was able to effect a pre-judgment garnishment of the wages of a debtor.
 
 
 52
 The fact pattern of the present case is quite similar: a creditor who has a dispute with a debtor, is in effect, holding some of the debtor's property as "hostage" in order to strengthen his position. It is true that whereas the Fuentes and Sniadach defendants were obliged to enlist minor governmental functionaries to perform ministerial acts, the garagemen here, already in possession of the debtor's property by dint of the limited bailment, did not have to make use of such services. But I do not believe that this factual difference should cause divergent conclusions as to the presence, vel non, of state action, particularly because the similarities are more significant. The creditor in all cases is utilizing a governmentally-approved power of detainer as a weapon in his dispute with the debtor. The defendants in Fuentes and Sniadach, as well as the garagemen in this case, are delegates of the state's conflict determination mechanism. This might well require the uniform application of the fourteenth amendment safeguards.
 
 
 53
 Further, the type of harm suffered by the plaintiffs here would seem to parallel that inflicted upon the plaintiffs in Fuentes and Sniadach. In those two cases, the financially-strapped debtors were deprived of the use of vital chattels or cash. The Supreme Court noted that the purportedly provisional nature of creditors' remedies being utilized in those situations could transmute into a final disposition of the controversy, since the debtor might have a critical need for the detained chattel or cash and might thus be forced to yield to the creditor's demands in order to regain his property.[21] The same point could be made about the plaintiffs in this case with respect to the detained vehicles. It would appear that if the protections of due process were needed to cushion the exercise of the dispute resolution mechanism in Fuentes and Sniadach, they may well be equally essential in the situation before us.[22]
 
 
 54
 Although the state action analysis articulated here is not as potentially expansive as that set forth in Judge Gibbons' opinion, it nonetheless could have the effect of augmenting to some degree the already large docket of section 1983 suits. But the solution to the docket problem should not lie in an unduly narrow interpretation of state action, a constitutional concept. Instead, since section 1983 is an act of Congress, the proper remedy for the increasing flow of these suits would be for the legislature to revise the applicable legislation if it believes such a step to be appropriate.[23]
 
 
 55
 GIBBONS, Circuit Judge, concurring.
 
 
 56
 When this case was before the original panel the members were unanimous on the judgment which should be rendered but divided respecting the doctrinal analysis supporting it. Two judges joined in an opinion supporting the judgment on one doctrinal approach. The third judge, the author of the majority opinion for the court in banc, filed a separate opinion. When, in accordance with its policy, the full court received copies of the opinions prior to filing, it voted to consider the case in banc. Now, after such consideration, seven of the nine judges are agreed on the identical judgment on which the panel was unanimous, but five of the nine have agreed with the author of what was the panel's minority doctrinal view. Obviously, then, this is a case in which the court is far less concerned with the outcome between the litigants before it than with the transcending effect in other cases of one doctrinal approach rather than another. The conflicting analyses must be perceived by the majority as having far different capacities for legal growth, and as resulting in far different social consequences. This extraordinary event, a court of appeals taken a case in banc chiefly for the purpose of reassigning the majority opinion, proclaims that those legal and social consequences will, in the majority view, be far reaching, and that those following from the majority's approach are desirable.
 
 
 57
 Although the majority opinion does not disclose why the difference in analysis is of such transcending importance, or where its doctrine will lead, there is no doubt that the opinion casts a much different and much longer shadow than that of the panel majority. If the case is as significant as the majority of the full court obviously believes, then the competing considerations of social policy supporting one approach to its resolution over another should, it seems to me, be exposed for full public scrutiny. This opinion will attempt to do so.
 
 I. THE PROBLEM
 
 58
 In a series of cases beginning with Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) and most recently including North Georgia Finishing v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), the Supreme Court has, by application of the due process clause of the fourteenth amendment, significantly altered the relative power positions of creditors and debtors. It has done so by insisting that creditor remedies made available by virtue of state law meet certain specified requirements of notice and opportunity to be heard before property of debtors can be transformed into property of creditors. This change in the law respecting transfer of debtor property was accomplished by judicial lawmaking, but the effect of the change was no different than if it had been accomplished by congressional action pursuant to section 5 of the fourteenth amendment. That effect was to impose national minimum due process requirements for such transfer, standards uniformly applicable in state or federal courts.
 
 
 59
 Creditor groups generally, and some judges, were disturbed by the imposition of a new national law of minimum due process for the transactions in issue. In many cases the judicial disquiet arose from a judicial philosophy favorably disposed toward the protection of creditors.[1] In other cases, the disquiet arose from a political philosophy of distrust of national lawmaking through the fourteenth amendment and of confidence only in the fairness and wisdom of local solutions.[2] The obvious strategy of the creditor groups and like-minded judges was to devise a constitutional law doctrine which would not merely relegate to state courts all litigation between debtors and creditors over transfers of debtor property, but which would insulate creditor remedies altogether from the reach of national lawmaking under the fourteenth amendment.
 
 II. THE CREDITOR STRATEGY
 
 60
 The law of permissible creditor remedies underwent an uneven but centripetal evolution in the direction of minimum national due process standards during the time from Sniadach v. Family Finance Corp., supra to North Georgia Finishing v. Di-Chem, Inc., supra. Meanwhile, in a field entirely unrelated to creditor remedies there emerged evidence first of the arrest of a former centripetal legal development, and later, evidence of a centrifugal evolution back toward deference to localism. I refer, of course, to Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) and Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), in both of which the Supreme Court prevented the implementation of settled national law standards of conduct by refusing to find state action. These cases suggested the strategy for creditor groups. If federal courts could be persuaded to overlook the obvious distinctions between the state action issues posed in those cases and the state action issues posed in the context of seizure and foreclosure of debtor property, and to rely on those cases as appropriate analogies, then a large range of creditor remedies could be insulated from the reach of national lawmaking under the fourteenth amendment by Court or Congress.
 
 III. THE COURT'S RESPONSE
 
 61
 The creditor strategy was first tried out in this court in Gibbs v. Titelman, 502 F.2d 1107 (3d Cir.), cert. denied sub nom. Gibbs v. Garver, 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974), and it found a receptive climate. Treating state action for fourteenth amendment purposes as if it were a unitary concept, the Gibbs v. Titelman panel held that the foreclosure of a debtor's interest in an automobile by a non-judicial sale did not involve state action and thus did not fall within the reach of the evolving national law of debtor property protection. Unlike in this case, however, those who objected to the doctrinal formulation of the panel opinion in Gibbs v. Titelman could not muster five votes for in banc reconsideration. The message of Gibbs v. Titelman to creditor group lobbyists and brief writers was clear. If one can prevail upon state legislators and courts to recognize non-judicial foreclosure methods, one may persuade this court, at least, that non-judicial creditor remedies are beyond the reach of national due process standards. Today the majority reiterates that message. Its insistence in this case upon the purity of its doctrine shows the strength of its commitment to fencing off from national law, wherever possible, whole areas in which action taken under color of state law can be "privatized." The signal to creditor lobbyists and draftsmen will not be missed. Moreover the "privatizing" strategy espoused by the majority has obvious ramifications for dismemberment of the fourteenth amendment in areas other than creditor remedies.
 
 IV. STATE ACTION IS NOT A UNITARY CONCEPT
 
 62
 The majority opinion holds that a garageman who retains possession of an automobile pursuant to a lien arising under Pennsylvania common law does not act under color of that law, while the same garageman who sells the same car in foreclosing that lien on the authority of a Pennsylvania statute does act under color of that statute.[3] In arriving at the peculiar distinction, in a decision based on political and social philosophy, the majority discusses the case as if it has actually made no such decision but has merely yielded to the result compelled by precedent. But by the selection of precedent one can construct syllogisms of surface appeal to yield logically sound but nevertheless improper conclusions. By taking language from an opinion in which state action is presented in one context and applying it mechanically to a situation in which the state action is of an entirely different order, the majority has done precisely that. Using Judge Aldisert's opinion Magill v. Avonworth Baseball Conference, 516 F.2d 1328 (3d Cir. 1975) as if it were intended as an all-inclusive analysis of state action issues for all contexts, it color-matches the instant case to the three contexts discussed therein, and then engages in the distinguishing game. But as his concurrence in Part IV of this opinion indicates, Judge Aldisert never intended that the Magill opinion freeze all fourteenth amendment jurisprudence in this circuit in a rigid framework, or limit all analysis to that which was appropriate to the disposition of that case. Indeed, the majority of this court rejected the very woodenness of the instant majority opinion in the more recent opinion in Braden v. University of Pittsburgh, et al., 552 F.2d 948. There, Judge Adams recognized that the appropriate model of state action analysis depends upon the setting in which the question is presented.[4] The instant majority opinion ignores Braden.
 
 
 63
 Moreover, even if it were intended that Magill's three categories be all inclusive, it would have to be recognized that they take on different meanings in different settings. For example "significant involvement" means one thing in the context of permitting an all-boys baseball team to use a public park, another in the context of allowing officers of a state university to engage in sex or race discrimination, and yet another in the context of making law, common or statutory. Certainly lawmaking is "significant involvement" in the activity governed by the law.
 
 
 64
 That incorporeal entity, "The State," is presented in the case law of the fourteenth amendment in many different visages. Without pretending that the list I am about to suggest is more likely to be fully comprehensive than others which have been tried, I think it worthwhile to make an attempt at distribution, if for no other reason than to point out that some of the state action cases on which the majority opinion relies are not really relevant to the case before us, nor are many of those it "distinguishes." I suggest, then, that we must endeavor to look discerningly at the several different ways in which a state may be functionally involved in action of a "private" party. I would classify these functions as (1) the state as a principal; (2) the state as a delegator of functions; (3) the state as a coercer, (4) the state as a sanctioner and facilitator of transactions; and (5) the state as a lawgiver. Since the state is an incorporeal entity, when one speaks of "state action" one cannot refer to action in the physical sense. Rather, in every instance one refers to the action of some person or persons, and determines that, because of its functional relationship to the state, the person's action should be attributed to the state for purposes of the fourteenth amendment.
 
 A. The state as a principal
 
 65
 Though incorporeal, the state, through agents, carries on governmental and proprietary functions on behalf of us all. Our recent Braden case is a typical example. If, as we have concluded, the University of Pittsburgh is actually an instrumentality of the Commonwealth, then the Commonwealth must insist that the University's employees, its agents and ours, act toward persons dealing with it in an exemplary fashion. The fourteenth amendment imposes an affirmative obligation with which those agents must comply, even in cases where the state has by law imposed the same obligation. If the state or its subdivision owns a park, it cannot permit its agents in charge of that park to discriminate. Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).[5] If a state or its subdivision operates what was once a private institution, its agents in charge of the institution may not be permitted to discriminate. Commonwealth of Pennsylvania v. Brown, 392 F.2d 120 (3d Cir.) (in banc), cert. denied 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968). If the state or its subdivisions employ officers to perform the police function, those officers must perform them in an exemplary fashion, meeting a fourteenth amendment standard, even when their action is actually in violation of state law. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). If the state has a significant proprietary interest in business premises, the operators of that business may take on such a relationship with the state that they will be treated as agents, and the state as principal. Those operators, too, will be required to act in the same exemplary manner as must other state agents. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The governing principle of these state-as-principal cases is that the people as a commonwealth, a political unit, simply cannot do some things, or permit their agents to do some things, that as individuals they could do. But these cases have little or nothing to do with the state action issues in the instant case. The garagekeeper, whether he is retaining possession or foreclosing his lien by sale, is acting solely in his own interest, whereas the university president, the parkkeeper, the police officer and the innkeeper lessee of a publicly owned place of business are acting at least in part on behalf of the State.
 
 B. The state as a delegator of functions
 
 66
 Given the rule that agents of the State must act on behalf of that principal in an exemplary manner, it is a necessary corollary that the principal cannot, by a process of delegation, isolate the action of persons who would otherwise be within the reach of the fourteenth amendment. Thus so-called private entities have been found to be engaging in state action when the State has permitted them to exercise functions formerly exercised more directly on its behalf. E. g., Evans v. Newton, supra (change of trustees of a municipal park); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town). There has been some recent indication that states may have more leeway in delegating functions than heretofore. Hudgens v. N. L. R. B., 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). But we need not explore the cases on delegation. The cases on delegation like the state-as-principal cases of which they are corollaries, are irrelevant to the instant issues for the same reason. The garagekeeper is acting on his own behalf, not for the public.
 
 C. The state as coercer
 
 67
 Where the action of private persons takes place in connection with a business or institution in which the state has no proprietary interest, and which can in no sense be regarded as governmental, that action may nevertheless be regarded as taking place under color of state law where the state, by statute, ordinance, or enforced custom in effect coerced the private actions. E. g., Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Robinson v. Florida, 378 U.S. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964); Lombard v. Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); Peterson v. Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963). These cases do not involve the obligation of the state's agents to act in an exemplary manner, for in fact no proprietary or governmental activity is being carried on. Nor do they turn on the fact that the actors have become willing participants in a joint activity with such agents, for the outcome is the same whether the actors are willing or unwilling participants. They stand for the proposition that when the action by private persons which deprives others of constitutional rights is coerced by state law, whether the law is a statute, an ordinance, the common law or a custom or usage, its coercive effect, actual or potential, on the conduct of the actor suffices to make the action one under color of state law. The coerced action cases, too, are irrelevant to the instant problem, for as the majority opinion correctly points out, Pennsylvania has neither compelled nor coerced the defendants to retain the plaintiffs' vehicles.[6]
 
 
 68
 Perhaps intermediate between the group of cases in which the state's role is coercive and the group of cases in the next subsection in which the State appears as sanctioner and facilitator are Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) and Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 16 (1969). In these cases, while the state law in issue did not by its terms sanction or facilitate discrimination, it did so indirectly by repealing preexisting legal restraints upon such activity. The Court held that the State was implicated in the anticipated discrimination and the repealing legislation was challengeable under the fourteenth amendment. Casually, in a single sentence, the majority "distinguishes" these authorities with the observation that "(t)he private activity with which we are here concerned does not involve racial discrimination and therefore, like many of our sister circuits, we do not find the analysis of Reitman and Hunter controlling." Majority Opinion at 137. Without explanation or analysis, the majority commits this Circuit to the proposition that the meaning of state action varies, not according to the relationship between the activity complained of and the authority of the Commonwealth, but according to whether race is involved. I had thought, until this throw-away line in the majority opinion received majority sanction, that we had in Magill v. Avonworth Baseball Conference, supra, firmly rejected such an approach. Certainly we declined in that case to establish a hierarchy of constitutional values, with race at the head of the list and sex somewhat lower. See also Hollenbaugh et al. v. Board of Trustees of Carnegie Free Public Library, 545 F.2d 382 (3d Cir. 1976).
 
 
 69
 The issues lurking in the majority's adoption of a hierarchical approach to constitutional rights for purposes of determining the existence of state action are enormously complex and deserve less casual treatment. Implicit in the majority's distinction of Reitman and Hunter is the assumption that the fourteenth amendment may apply differently when, for example, the president of a state university engages in race discrimination, or engages in sex discrimination, or inhibits speech or association, or deprives a teacher of property without due process of law. Judge Henry Friendly, in an article exploring, among other issues, some implications of the holdings of Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) and Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), argues that a less stringent test for determining whether action is taken under color of state law should apply when a case involves racial discrimination than when it does not. Friendly, the Dartmouth College Case and The Public-Private Penumbra, 12 U.Tex.L.Q. 9 (1969). He rearticulated that thesis in Coleman v. Wagner College, 429 F.2d 1120, 1127 (2d Cir. 1970) (Friendly, J., concurring), and it has gained some currency in other opinions.[7] The thesis has never been approved by this court, and so far the opinions of the district courts in the Third Circuit have rejected it. See, e. g., Isaacs v. Board of Trustees of Temple University, 385 F.Supp. 473, 485 n. 3 (E.D.Pa.1974) (Higginbotham, J.). Cf. Rackin v. University of Pennsylvania, 386 F.Supp. 992, 995-96 (E.D.Pa.1974) (Wiener, J.) (applies Second Circuit's racial state action standard in a non-race case). In Braden v. University of Pittsburgh, supra, we relied extensively on Judge Higginbotham's opinion, and at least implicitly rejected the contention that for determining whether action took place under color of state law there was a hierarchy of values between race and sex.
 
 
 70
 Judge Friendly's effort to find a formula for state action based on a hierarchy of constitutional values is, as with all his scholarly endeavors, impressive. I nonetheless find it unpersuasive. The result of its adoption would be to hinge the availability of the national law applicable to the states by virtue of the fourteenth amendment not on the relationship between the actor and the state but on a prejudgment by the judge, state or federal, of the importance of the rights being claimed on his subjective scale of constitutional values. It is true, of course, that in discussing the merits of claims for constitutional protection we make evaluations of the relative worth of competing claims of the opposing party and of society. But when we do so on the merits we are forced to articulate our reasons for tilting the scale one way or the other. By the device of a "non-decision," turning the result on the absence of state action in a particular context, a judge makes subjective social policy decisions without exposing those reasons. The instant case is a particularly apt illustration.
 
 
 71
 Some judges in the majority are, on the evidence of prior opinions, uncomfortable with the evolution of a national law of debtor-creditor relations since Sniadach. By holding that there is no state action in the retention of chattels pursuant to a common law garageman's lien, because this is a due process case rather than an equal protection case, they can decide not to apply the national law without exploring for the parties and the public the reason for their discomfort. They can at the same time remain free to find action under color of state law by parties identically postured toward the state when the claim is more appealing to their subjective value system.
 
 
 72
 I would not adopt the hierarchical approach to constitutional values which the majority so casually espouses, not only because it presents too many opportunities for concealed subjectivity, but also because I know of no principled basis upon which to say that the national law in one area is less entitled to implementation by virtue of the Supremacy Clause than the national law in another area. State action is not a unitary concept, but neither is it a chameleon, changing hue depending on which provision of the Bill of Rights or which clause of the fourteenth amendment is involved.
 
 
 73
 D. The state as a sanctioner and facilitator of transactions
 
 
 74
 It is at least theoretically possible that in Rousseau's state of nature, private transactions would take place without the sanction of a legal system and the facilitation provided by courts and sheriffs. But Pennsylvania is not that state. Its law sanctions the garagekeeper's retention of possession, and sale, and its law prevents the owner's resort to self-help to prevent either. The district court concluded, despite such sanction and facilitation, that neither the retention of possession nor the sale were under color of state law. The majority concludes that the former is not, but the latter is.
 
 
 75
 Fourteenth amendment jurisprudence could, of course, have taken the direction that state sanctioning or facilitation of private transactions is outside its reach. But it has taken a different direction. As the majority acknowledges, Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed.2d 1586 (1953) and Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) hold that some private transactions may not be sanctioned or facilitated. An attempt is made to distinguishing these cases on the ground that ". . . the defendants never invoked the assistance of the state courts to enforce their liens."[8] Such a distinction is meritless, of course, as Judge Hunter's concurring opinion ably demonstrates.
 
 E. The state as law giver
 
 76
 The majority justifies its distinction, which in any functional sense is no distinction at all, by drawing a line between the common law which antedated the fourteenth amendment and a statute enacted thereafter.[9] In drawing such a line the majority makes some fundamental assumption, with which I cannot agree, about the nature of positive law and about the nature of the state as an institution and its relationship to positive law.
 
 
 77
 (1)
 
 
 78
 At the outset, I emphatically disagree that the ancient lineage of the repairman's possessory lien bears at all upon the fourteenth amendment state action issue. The creation of property interests by state law prior to 1867 was state action, but that action did not at that time have to comport with constitutional limitations not then in existence. After ratification of the fourteenth amendment, however, a new form of scrutiny of state property law was required. See Jonnet v. Dollar Savings Bank, 530 F.2d 1123, 1133-36 (3d Cir. 1976) (concurring opinion). Cf. U. S. Industries, Inc. v. Gregg, 540 F.2d 142, 152, 154 (3d Cir. 1976). No state law classification can escape such scrutiny now, merely because it was made then.
 
 
 79
 (2)
 
 
 80
 Certainly the creation of law is state action. Indeed, state sovereignty, an incorporeal conception, is manifested chiefly if not solely by the common recognition of the sovereign's law-making authority. The enactment of a statute, such as the foreclosure statute here challenged, must be recognized as state action in its purest form. This is no less true of a state's common law. Since Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it is acknowledged by federal judges that the common law is the law of a sovereign, state or federal. The common law possessory lien of which the plaintiffs complain has no more existence apart from the sanctioning authority of the Commonwealth's sovereignty than has any Pennsylvania legislative enactment. Its initial pronouncement by a court rather than a legislature is irrelevant to the state action issue.
 
 
 81
 This is not to say that because all human activity takes place within the framework of law all human activity involves state action. The law may define an area within which collective society asserts no interest, and leave decisions therein to private ordering. For example, the law defines matters such as familial relationships and leaves to private family ordering large areas of internal family decision making. Thus a decision by a parent to censor the reading material of a juvenile family member is not within the reach of the fourteenth amendment simply because state law defines the status of minority. On the other hand, the state's definition of that status, whether by common law or by statute, clearly is state action. Thus while a contention that the reading matter of an admittedly unemancipated juvenile is being censored would not implicate state action, a contention that the state classified women as unemancipated in a manner different from men, in violation of the equal protection clause, clearly would. See Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); Stanton v. Stanton, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).
 
 
 82
 Similarly, the state law of contracts provides a framework within which private ordering may take place. That does not mean that every private contract must be measured against the minimum national standards of fourteenth amendment due process or equal protection. But clearly, when the state makes a classification as to what contracts are permissible, that classification is state action. Cf. Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 100, 58 S.Ct. 443, 82 L.Ed. 685 (1938) (existence of contract a federal question, notwithstanding determination to contrary by highest court of a state). If a gaming stakeholder refused to deliver the stake to the winner on the ground that the state law prohibited such a contract, his action would be taken under color of the state's classification, and the permissibility of the classification would have to be evaluated against a fourteenth amendment backdrop.
 
 
 83
 Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 9 L.Ed.2d 265 (1946) and related cases illustrate the same principle. Marsh holds that a whole town cannot be "privatized" and removed from the scope of the fourteenth amendment by the expedient of transferring title to a private entity. That idea was extended in Amalgamated Food Employees Union, Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). Although Logan Valley was later overruled, Hudgens v. N.L.R.B., 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), the brute fact remains that even Hudgens reaffirms the essential principle of Marsh, Logan Valley and Indiana ex rel. Anderson v. Brand: the extent to which state law may relegate conduct to private ordering is a federal question. That very relegation is state action.
 
 
 84
 State law is also the source of the institution of private property, and defines the incidents of that institution. See, e. g., Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); cf. Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Kleppe v. New Mexico, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). But while the definition of those incidents is state action, it does not follow that every choice by a property-holder among alternative uses permitted by the state's definition is taken under color of state law. When the state has merely created a framework within which private choices are made, those elections often may be considered private. See, e. g., Hudgens v. N.L.R.B., 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). In contrast, when a person takes or withholds action in reliance upon a classification made not by such private choices but by the state itself, that person's action necessarily is under color of state law. The law of testate and intestate succession provides an apt illustration. The state statute of wills may authorize a property owner to distribute his property on death to whomever he pleases. His choice, no matter how arbitrary, does not involve state action merely because it is made within the legal framework provided by the Wills Act. On the other hand, if he makes no will and his administrator makes distribution in accordance with a state law which excludes persons such as illegitimates, the administrator's action is taken under color of state law, and the law relied upon is tested by fourteenth amendment standards. See Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971); Glona v. American Guaranty & Liability Insurance Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968); Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968). In such cases the state, not the testator, has by law defined the property interest, and the definition is state action. The fact that the property owner could have made a will including his illegitimate offspring in his largesse is irrelevant. The administrator's action is taken not under color of the decedent's private choice not to make a will, but under color of the state's classification.
 
 V. THERE IS STATE ACTION HERE
 
 85
 In the cases before us the retention of possession by the repairmen was not merely accomplished under color of a private agreement which the Commonwealth permits. Gibbs v. Titelman is therefore distinguishable. See 502 F.2d 1107 at 1113 n. 15a. In no case was the subject matter of the possessory lien even discussed between bailee and bailor. To the contrary, it was made under color of the common law of the Commonwealth of Pennsylvania which, entirely apart from any private agreement, created by operation of law in favor of the repairman a property interest superior to that of the owner. The defendants insist that their action should nevertheless be considered private. They support their position with two lines of argument.
 
 
 86
 They first urge that the plaintiffs could have avoided the operation of the possessory lien by insisting, in advance of delivery of their vehicles for repair, upon a contractual waiver of the lien. Thus, they argue, it was the plaintiffs' private neglect to obtain such a contractual waiver which resulted in the creation of the lien. The argument is irrelevant, however, for purposes of the constitutional inquiry. Even if we accept defendants' dubious proposition that a potential customer has a realistic chance of bargaining for a waiver of the lien, the fact remains that in these cases no releases were obtained. The ensuing exercises of dominion and control over the impounded vehicles by the repairmen must be traced directly to a single legitimizing source state law. It should also be noted that in each of the illegitimacy cases a testator could have avoided application of the state law of intestate succession by drawing an instrument that conformed to the pertinent wills act. That the Supreme Court reached the merits of the constitutional challenge in each of those cases demonstrates that that fact was of no consequence for state action purposes.
 
 
 87
 The defendants next urge that because they could have surrendered possession of the impounded cars instead of continuing in possession as authorized by the lien law, the state is in no way implicated in their acts. But again, the fact is that in each instance the repairman did continue to assert his lien. The choice to continue in possession is a private election in the volitional sense, but it is Pennsylvania law that creates, purports to legitimize, and sanctions the right of continued possession that is availed of. The impoundment of the plaintiffs' automobiles was action taken under the color of the Commonwealth's law, and that law must satisfy fourteenth amendment criteria.
 
 
 88
 While it seems plain that the common law possessory lien is a product of state action, the foreclosure statute is, as the majority concedes, an a fortiori example. In the absence of an authorizing statute, a repairman could do no more than retain possession of a chattel while he sued in assumpsit to collect sums due. A judgment could be executed by levying on the retained chattel. Undoubtedly, rendering the judgment in assumpsit, levying execution and holding a judicial sale would all involve state action. Pennsylvania has by statute provided an alternative method of foreclosure. The issue is not whether, when the state provides a process for resolving disputes over interests in property, the process is state action. That has always been clear. See, e. g., Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Rather, the issue is the dimension of the process that the state must afford parties to the property dispute. The complexity of the problem is well exemplified by a recent series of cases in which the Supreme Court and this court have considered attacks upon summary methods of resolving private disputes over interests in property. North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Jonnet v. Dollar Savings Bank, supra. The complaint here is that both the creation of the lien and the permitted method of foreclosure are entirely too summary. Both the creation and the method of foreclosure are creatures of state law.
 
 
 89
 Conceding, as they must, that the requisite state involvement would be present if state officials directly participated in the foreclosure, the defendants argue that because the Pennsylvania statute permits foreclosure by a private sale, the foreclosure method should be free from fourteenth amendment scrutiny. But the evidence shows that defendants' characterization of the foreclosure process with respect to automobiles as purely private activity is inaccurate. The affidavit of Frank X. Garber, Director of the Bureau of Motor Vehicles of Pennsylvania, discloses that the Commonwealth actively participates and actively assists repairmen in lien foreclosures. Section 201(a) of the Vehicle Code, Pa.Stat.Ann. tit. 75, § 201(a), provides that
 
 
 90
 "(a) No person who is a resident of the Commonwealth shall own a motor vehicle . . . in this Commonwealth unless a certificate of title therefor shall have been obtained as provided in this act. . . ."
 
 
 91
 The statutory command is made enforceable with criminal penalties. For the right of foreclosure to have any value to a garageman, therefore, the law must provide some easy means for transferring title to an impounded vehicle from the owner to the lienholder. According to Garber's affidavit, the Pennsylvania authorities are very obliging. Upon request, the Bureau of Motor Vehicles will supply to a repairman Form MV-3, styled an "Application for Certificate of Title for a Motor Vehicle or Trailer Acquired Thru Repossession or Operation of Law." Upon receipt of a properly completed Form MV-3, together with other items required by § 208 of the Vehicle Code, Pa.Stat.Ann. tit. 75, § 208, a certificate of title will issue in the name of the foreclosing lienholder. It can thus be seen that the cooperation of state officials is instrumental to a lawful lien foreclosure. The involvement of the Commonwealth's agents is both direct and indispensable. While this involvement is perhaps not state action in its purest form, it should be sufficient to cross the constitutional threshold. Clearly there is facilitation of the sale and sanctioning of the result.
 
 
 92
 I do not rely on the necessary involvement of state officers in the lien foreclosure to establish state action in this case, however, for although that should suffice, I think it is clear that any state law providing a method of foreclosure is state action, and any foreclosure taken pursuant to such a law is action under color of that state law. If, for example, the state were to provide by law for non-judicial foreclosure of mortgages, that law would still have to provide for the kind of process notice to and opportunity to be heard for interested parties, for example that the fourteenth amendment requires.
 
 
 93
 The defendants also rely on a line of cases which have described self-help repossession under § 9-503 of the Uniform Commercial Code as private activity to which the fourteenth amendment does not apply. Most prominent among those cases are this court's decision in Gibbs v. Titelman, 502 F.2d 1107 (3d Cir.), cert. denied, 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974), and the Supreme Court's summary disposition of Benschoter v. First National Bank, 218 Kan. 144, 542 P.2d 1042 (1975), appeal dismissed for lack of a substantial federal question, 425 U.S. 928, 96 S.Ct. 1656, 48 L.Ed.2d 170 (1976).[10] The latter judgment, through summary, is authoritative until overruled. Hicks v. Miranda, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). But this court has recognized that there is a significant distinction between a right to possession contractually agreed upon and a right to possession predicated solely upon a state law. In Gibbs v. Titelman, supra, we explicitly reserved decision with respect to the latter situation. 502 F.2d at 1113 n.15a. And just as Gibbs v. Titelman involved a contractual undertaking, see 502 F.2d at 1109, so did Benschoter v. First National Bank, supra. See 218 Kan. at 145, 542 P.2d at 1044. Thus neither case is controlling on the state action issue presented in this case. As pointed out above, the state may provide a legal framework within which private ordering by contract may operate, and such private ordering may not involve state action. Here, however, both the creation of the lien and the method of foreclosure are creatures of law, not of private contract.[11]
 
 
 94
 The cases which I do find in point are Hernandez v. European Auto Collision, Inc., 487 F.2d 378 (2d Cir. 1973); Adams v. Department of Motor Vehicles, 11 Cal.3d 146, 113 Cal.Rptr. 145, 520 P.2d 961 (1974); Whitmore v. New Jersey Division of Motor Vehicles, 137 N.J.Super. 492, 349 A.2d 560 (Ch.Div.1975); Caesar v. Kiser, 387 F.Supp. 645 (M.D.N.C.1975); Mason v. Garris, 360 F.Supp. 420, modified, 364 F.Supp. 452 (N.D.Ga.1973) (per curiam); Straley v. Gassaway Motor Co., 359 F.Supp. 902 (S.D.W.Va.1973); Cockerel v. Caldwell, 378 F.Supp. 491 (W.D.Ky.1974), and Ford v. Dean's O. K. Tire Store, Inc., CCH Pov.L.Rep. P 16,856 (D.Nev.1973), all of which reached and decided the merits of challenges to repairman's lien and lien foreclosure laws which were indistinguishable, for state action purposes, from Pennsylvania's. Also closely in point are cases considering on the merits challenges to landlords', innkeepers', and mechanics' possessory lien laws. See, e. g., Culbertson v. Leland, supra; Ragin v. Schwartz, 393 F.Supp. 152 (W.D.Pa.1975); Blye v. Globe Wernicke Realty Co., 33 N.Y.2d 15, 347 N.Y.S.2d 170, 300 N.E.2d 710 (1973); Johnson v. Riverside Hotel, Inc., 399 F.Supp. 1138 (S.D.Fla.1975); Barry Properties, Inc. v. Frick Brothers Roofing Co., 277 Md. 15, 353 A.2d 222 (1976).
 
 
 95
 The Seventh Circuit cases, Phillips v. Money, 503 F.2d 990 (7th Cir. 1974) (garagekeepers' lien) and Anastasia v. Cosmopolitan National Bank, 527 F.2d 150 (7th Cir. 1975), cert. denied 423 U.S. 928, 96 S.Ct. 1143, 47 L.Ed.2d 338 (1976) (innkeepers' lien), were in my view incorrectly decided to the extent that they predicate their holdings on the absence of state action in a non-contractual setting.
 
 
 96
 In summary, I conclude that the ground upon which the district court relied in granting summary judgment the absence of state action cannot sustain that judgment either on the impoundment claim or on the foreclosure by sale claim.
 
 
 97
 VI. THE MERITS OF THE FOURTEENTH AMENDMENT CHALLENGE
 
 
 98
 The Pennsylvania schema under consideration may be briefly summarized. Pa.Stat.Ann. tit. 6 & 11 recognizes a "common law lien" in favor of a repairman. Section 12 authorizes the repairman, while the property remains in his hands, to notify the owner in writing of the amount of the claimed repair indebtedness. If the claim remains unpaid for thirty days following the notice, the chattel can then be sold on ten days' notice. Section 12 also describes the requirement of notice. Section 13 provides that the seller shall, upon demand within 6 months following sale, pay over to the owner the residue in excess of the lien costs. If no demand is made the residue escheats to the county for its use. Section 14 provides that all sales made pursuant to the foreclosure statute shall be conclusive as to the title conveyed.
 
 
 99
 If the owner disputes the notice of claim his sole remedy, according to § 11, is to institute an action in replevin within 30 days. The foreclosure statute does not describe that remedy. Under the recently amended Pennsylvania Rules of Civil Procedure governing replevin, Pa.R.Civ.P. 1071-87, however, a hearing on a complaint for a writ of seizure may be held within 48 hours, Pa.R.Civ.P. 1075. A double value bond is required for the issuance of such a writ. Pa.R.Civ.P. 1075.3. Thus the owner of an impounded vehicle cannot regain possession without posting a bond for twice the value of the property, or paying the disputed claim. Failing either he may be permanently deprived of that property.
 
 
 100
 The governing precedents against which this schema must be measured are North Georgia Finishing, Inc. v. Di-Chem, Inc., supra; Mitchell v. W. T. Grant Co., supra; Fuentes v. Shevin, supra ; and this court's recent synthesis of those cases in Jonnet v. Dollar Savings Bank, supra. In Jonnet we concluded that a balancing inquiry must be made between the interest of creditors in restraining a res from which their claims can be satisfied and the interest of debtors in retaining freedom of use and disposition of property. See 530 F.2d at 1129. Analytically, the retention lien and the statutory method of foreclosure present distinct problems, since the former involves only a temporary deprivation of use, while the latter totally terminates the owner's property interest.
 
 A. The retention lien
 
 101
 Common to this retention lien case and to Fuentes and Mitchell is the nature of the creditor-debtor relationship: a commercial creditor and a consumer debtor. But unique to this lien is the fact that the initial possession is consensual. The effect upon the debtor of the retention of possession in this case, however, is certainly analogous to the impact of the seizures in Fuentes, Mitchell, North Georgia Finishing and Jonnet. Yet in this case, unlike the other four, the retention is accomplished by self-help rather than by judicial process. Common to this and all the other cases is the fact that the "seizure", whether by judicial process or by self-help retention of possession, is accomplished ex parte. In contrast with the other four cases, the retention of possession here is permitted without the filing of any pleading. In contrast with Fuentes, Mitchell and North Georgia Finishing, but in common with Jonnet, the "seizure" takes place without the posting of a bond. In all five cases state law provides for a dissolution procedure upon the posting of a debtor bond. In common with Mitchell, state law provides for a post-"seizure" hearing to determine probable cause for the continued change of possession, although unlike Mitchell the hearing is not mandatory and must be initiated by the debtor. Finally, in common with Fuentes and Mitchell, the debtor and the creditor both have property interests in the retained property, since Pennsylvania law recognizes a repairman's interest in property to which he has presumptively added the value of parts and/or labor.
 
 
 102
 This recital of the similarities and differences between the governing precedents demonstrates that the validity of the retention lien is a question of some difficulty. Compounding the difficulty is the fact that the bare majority in North Georgia Finishing included Justice Douglas, while Justice Stevens' position on summary creditor remedies is not yet known. Moreover, Justice Powell concurred in the result in North Georgia Finishing while strongly restating his view that the state had a legitimate interest in facilitating creditor collections through the use of provisional remedies. See 419 U.S. at 610, 95 S.Ct. 719. (Powell, J., concurring).
 
 
 103
 This thread of uncertainty runs through the lower federal and state courts as well. The Seventh Circuit in Phillips v. Money, supra, the Western District of Kentucky in Cockerel v. Caldwell, supra and the Middle District of North Carolina in Caesar v. Kiser, supra, all have concluded that the state's interest, in encouraging the repairman's service business by allowing him to retain possession of a chattel on which he has worked until he is paid, is sufficient to justify the retention lien. Cf. Ross v. Brown Title Corp., 356 F.Supp. 595 (E.D.La.), aff'd mem., 412 U.S. 934, 93 S.Ct. 2788, 37 L.Ed.2d 394 (1973); Spielman-Ford, Inc. v. Hanson's Inc., 379 F.Supp. 997 (D.Ariz.1973), aff'd mem., 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974). Hernandez v. European Auto Collision, Inc., supra; Mason v. Garris, supra ; and Whitmore v. New Jersey Division of Motor Vehicles, supra, all adverted to the issue, but did not decide it. The Southern District of West Virginia in Straley v. Gassaway Motor Co., supra, and the District of Nevada in Ford v. Dean's O.K. Tire Store, Inc., supra, struck down retention lien provisions. In none of these cases has the court made an analysis of sufficient lucidity to compel adherence. We are, in short, on our own.
 
 
 104
 I conclude, not without doubts, that the repairman's common law retention lien is not invalid under the fourteenth amendment. The state's interest in creating this property right by law is clear, since the service function rendered is socially significant, if not essential. I also attach significance to the fact that unlike the other four cases I principally look to for guidance, the initial change in possession here was consensual. See Adams v. Department of Motor Vehicles, supra. At common law the repairman could not accomplish a total extinguishment of the owner's property right, and I assume that apart from the foreclosure statute the repairman would still be required to resort to a suit and an execution. Even if apart from the foreclosure statute there would be no time limit on the common law lien, a replevin remedy has always been available to the debtor. A troublesome aspect of that remedy is the double value replevin bond requirement, as Chief Judge Seitz and Judge Aldisert point out. The issue is extremely close. Nevertheless, I conclude that in balancing the factors favoring the possessory lien against those mitigating against it, the choice made by Pennsylvania does not violate due process. Since Mitchell, a balancing test has been required in defining the limits of due process in matters of debtor property. This court has recognized that rule, Jonnet v. Dollar Sav. Bank of New York, 530 F.2d 1123, 1129 n.13 (3d Cir. 1976) (Rosenn, J.), as have the commentators, Note, 88 Harv.L.Rev. 41, 71, 72, 74-77 (1974).
 
 B. The foreclosure by sale statute
 
 105
 Standing in sharp contrast to the ambiguous response of state and lower federal courts to the question of the validity of repairmen's retention liens is the concert of opinion respecting foreclosure by non-judicial sale. I have not been able to find a single case in the wake of Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1965), sustaining against due process challenge a repairman's lien statute authorizing sale of the retained chattel without requiring some resort to the judicial process. Hernandez v. European Auto Collision, Inc., supra; Adams v. Department of Motor Vehicles, supra; Caesar v. Kiser, supra; Mason v. Garris, supra; Straley v. Gassaway Motor Co., supra; Cockerel v. Caldwell, supra; Ford v. Dean's O.K. Tire Store, Inc., supra and Whitmore v. New Jersey Division of Motor Vehicles, supra, all hold that such a method of lien foreclosure is constitutionally impermissible. Different courts have emphasized different features of the statutes under review in reaching those conclusions, but several themes frequently recur.
 
 
 106
 Of paramount importance is the substantial difference between the non-final deprivation of possession with which Fuentes, Mitchell and North Georgia Finishing were concerned, and the absolute extinguishment of the debtor's title which the non-judicial sale accomplishes. That deprivation is final even if in subsequent litigation the debtor establishes that the creditor's claims lacked merit. Fuentes and North Georgia Finishing are, in terms of the magnitude of the deprivation, a fortiori cases. See, e. g., Hernandez v. European Auto Collision, Inc., supra; Caesar v. Kiser, supra.
 
 
 107
 A second theme that has been struck is the inadequacy of the replevin remedy, which (like Pennsylvania's) typically requires the debtor to post a bond for an amount in excess of the value of the retained property as a condition precedent to contesting the underlying claims. See Whitmore v. New Jersey Division of Motor Vehicles, supra; see also Adams v. Department of Motor Vehicles, supra; Caesar v. Kiser, supra. A third theme is the substantial leverage given to the repairman in collecting a disputed bill by permitting him to sell retained property within a relatively short period of time without having to take any initiative in seeking a judicial declaration of the debt's validity.
 
 
 108
 Each of these reasons weighs against Pennsylvania's statutory foreclosure procedure in the constitutional balance. On the other side of the scale is the limited need for such a drastic foreclosure remedy in view of the repairman's right to a possessory lien and his access to a court of law, perhaps even a small claims court, where judgment can be obtained and execution levied upon retained property. The scale tips rather lopsidedly in favor of the plaintiffs in this case. Pennsylvania's lien foreclosure statute does not measure up to the requirements of due process.
 
 CONCLUSION
 
 109
 Since I have concluded that the repairman's right to retain possession is valid, I join in the judgment affirming the grant of summary judgment in favor of defendants against appellants Parks, Ellerbe, Williams and Muldowney, but not for the reasons relied upon in the majority opinion. Since I have concluded, as did the majority, that the foreclosure by non-judicial sale provisions of Pa.Stat.Ann. tit. 6, §§ 11-14 are invalid, I join in the judgment reversing the grant of summary judgment in favor of defendant North Penn Motors against appellant Dillon and remanding to the district court for further proceedings.
 
 JAMES HUNTER, III, Circuit Judge, concurring:
 
 110
 While I concur in the essential reasoning and the result of the majority, I wish to clarify my understanding of some implications in the majority opinion.
 
 I.
 A.
 
 111
 In Part II.A. of its opinion, the majority notes that this case does not present the issue of state court enforcement of the garagemen's liens. It is my understanding that the result in this case would not differ even if the state courts had in some way become involved in upholding the liens.
 
 
 112
 Every activity permitted under state common or statutory law, any activity that has legal consequences, can be transformed into a right enforced by state courts if the parties so chose. Alexander, Cutting the Gordian Knot: State Action and Self-Help Repossession, 2 Hastings Const.L.Q. 893, 896-99 (1975); Note, Procedural Due Process Post-Fuentes Constitutionality of Garagemen's Liens, 54 B.U.L.Rev. 542, 550-51 (1974). For example, the state courts would have enforced defendants' right to retain these automobiles against any attempt by plaintiffs to replevy them. If the state action analysis of these possessory liens turned upon the presence or absence of such state court involvement, the due process requirements attending the same conduct would vary from case to case. Surely the due process consequences of possessory liens should not vary at the whim of the private actors.
 
 
 113
 The "enforcement" doctrine of Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), and Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), would, if expanded to its logical conclusion, completely emasculate the concept of state action. See Black, Foreword: "State Action," Equal Protection, and California's Proposition 14, 81 Harv.L.Rev. 69, 94-95 (1967). It must be, therefore, and has been, cabined within the extraordinary jurisprudence of racial discrimination. The Supreme Court, 1968 Term, 83 Harv.L.Rev. 60, 118 & n.21 (1969). I do not understand the majority opinion to suggest otherwise.B.
 
 
 114
 I concur with the reasoning in Part II.B. of the majority opinion, but I wish to express my understanding of the majority's reasoning in Part II.C. I do not understand the majority to hold that all private activity permitted under the common law is purely private, while all private activity permitted under statutes is automatically state action. Both sources of law common law and statutes give rise to rules that can be stated as positive maxims for conduct; therefore, to regard one form of rules as state "encouragement" and the other merely as passive permission would seem irrational. Cf. Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (for purposes of federal question jurisdiction, "laws" includes both common law and statutes).
 
 
 115
 Furthermore, it is not at all clear why the meaning of the due process clause should turn upon painstaking and often barren analysis of the extent to which conduct was allowable at common law or by statute. It will often prove difficult, both for individuals and for courts, to determine precisely what the common law provided and the degree to which statutes have altered it. Compare, e. g., King v. South Jersey Nat'l Bank, 66 N.J. 161, 330 A.2d 1 (1974) (self-help repossession has "roots deep in the common law"), with, e. g., Gibbs v. Titelman, 369 F.Supp. 38 (E.D.Pa.1973), rev'd, 502 F.2d 1107 (3d Cir.), cert. denied sub nom. Gibbs v. Garver, 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974) (self-help repossession not "a historically sound principle of the common law").
 
 
 116
 Finally, distinguishing on the basis of common law versus statutory rules could mean that precisely the same conduct sanctioned by the common law in one state and by statute in another would entail different due process consequences in different states. Certainly the Constitution ought to visit the identical consequences upon the same conduct in Pennsylvania and in New Jersey.
 
 
 117
 Nonetheless, one aspect of state action analysis the public function inquiry can be affected in a limited way by the common law origin of a particular right. This would occur, for example, when it appears that a particular right of action has never been considered an attribute of sovereignty in a historical sense. As the majority opinion indicates, the repairman's right to retain an object pending payment for his repairs did not spring solely from the power of the state to resolve conflicts. Indeed, it is a form of private conflict resolution[1] dating from ancient times, in which the power of the state usually is not implicated at all. Note, Procedural Due Process Post-Fuentes Constitutionality of Garagemen's Liens, 54 B.U.L.Rev. 542, 554 (1974); Note, Possessory Liens: The Need for Separate Due Process Analysis, 16 Wm. & Mary L.Rev. 971, 996 (1975). See generally McCall, The Past as Prologue: A History of the Right to Repossess, 47 S.Calif.L.Rev. 58 (1973). And, as I pointed out above, state protection of the lienholder's right to possession, see e. g., Hammonds v. Barclay, 102 Eng.Rep. 356, 359 (K.B. 1802), does not automatically transform that possession into an attribute of sovereignty, any more than state protection of a lessee's possession would automatically transmute the lessee's possession into such an attribute. See also Davis v. Richmond, 512 F.2d 201, 204-05 (1st Cir. 1975). The right to retain the automobile pending payment, then, is not an attribute of the state's sovereignty.
 
 
 118
 In addition to the historically private nature of possessory liens, it remains true that they are effected without reliance on state power in the guise of a sheriff or other officer. See Gibbs v. Titelman, 502 F.2d 1107, 1114 (3d Cir.), cert. denied sub nom. Gibbs v. Garver, 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974). Therefore, I concur in the court's refusal to hold that private action pursuant to a garageman's lien amounts to state action.
 
 II.
 
 119
 In Part III. of its opinion, the majority concludes that the statutory grant to garagemen of the power to sell a vehicle for nonpayment does amount to the delegation of a public function. The majority appears to place great weight on the fact that the statute declares that such a sale will be "as conclusive to the title conveyed as if sold by a sheriff or constable," Pa.Stat.Ann. tit. 6, § 14 (Purdon's 1963). I agree that the garageman's sale does involve state action, but I do not believe that the words granting the power of sale have any effect on the result.
 
 
 120
 Until the passage of Pennsylvania's statute and those like it in other states granting the power of sale, the authority to divest an owner of any and all rights in his property was vested exclusively in the state. R. Brown, The Law of Personal Property § 119 (1955). Indeed, any sale to foreclose a possessory lien rendered the lienholder liable in conversion; he was required instead to obtain judgment and levy execution on the chattel. Comment, California Garagemen's Liens Impact and Aftermath of Adams v. Department of Motor Vehicles, 6 Pac.L.J. 98, 100 (1975). It follows that one who undertakes to sell a chattel held pursuant to a possessory lien performs a function traditionally carried out exclusively by the sovereign.[2]
 
 
 121
 Thus, the garageman who sells an automobile because his debtor has defaulted acts as an agent of the state. The words in which this power is clothed and the form of its grant common law or statutory must not be dispositive.[3] Otherwise, the state could manipulate its laws in order to change the due process implications of essentially identical activities. The due process clause ought not to be left so susceptible to circumvention.
 
 III.
 
 122
 To the extent that my comments reflect a proper understanding of the majority opinion, I concur therein.
 
 
 123
 SEITZ, Chief Judge, with whom Circuit Judge ALDISERT joins, concurring and dissenting in part.
 
 
 124
 The majority hold that defendants' nonconsensual possession of plaintiffs' vehicles pursuant to Pennsylvania's common law repairman's lien is not action under color of state law, and, therefore, affirm entry of summary judgment against all plaintiffs except Lois Dillon. They reverse the entry of summary judgment against Lois Dillon because Pennsylvania's statutory sale provision violates due process. I concur in that part of the court's judgment reversing as to Dillon, but because I believe that the repairman's nonconsensual possession is both action under color of state law and violative of due process, I dissent from that part of the court's judgment affirming the district court.
 
 
 125
 I join in parts IV and V of Judge Gibbons' opinion in which he concludes that defendants' actions under both the common law possessory lien and the statutory foreclosure sale provision are action under color of state law, and, therefore, must comply with due process standards. For the reasons stated by Judge Gibbons in part VI B of his opinion, I agree with all of my colleagues that the foreclosure by sale provisions clearly violate due process. Because the majority conclude that the repairman's possessory lien did not implicate state action, they found it unnecessary to consider whether the lien would satisfy due process standards. Judge Gibbons and Judge Adams reach the issue concluding that the lien procedure comports with due process. I also reach this issue but for the reasons which follow conclude that the lien procedures fail to provide the minimum safeguards against arbitrary or mistaken seizure required by due process.
 
 
 126
 It is now settled law that a temporary interruption in the use of personal property is the deprivation of a significant property interest entitled to due process protection. Traditionally, due process has meant that notice and hearing must precede the deprivation. In the context of provisional remedies, the hearing, designed to establish the probable validity of the underlying claim which is the basis for the seizure, fulfills one of the basic purposes of due process protection against the mistaken or arbitrary deprivation of property.
 
 
 127
 The Supreme Court has held that this purpose is fulfilled when a provisional remedy procedure, although not providing preseizure notice and hearing, does incorporate other protective preseizure procedures in conjunction with an immediate postseizure hearing after which the property must be returned unless the creditor proves his claim. This synthesis of Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) and North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975) was articulated in Jonnet Development Corp. v. Dollar Savings Bank, 530 F.2d 1123, 1128-29 (3d Cir. 1976).
 
 
 128
 In Fuentes and North Georgia Finishing statutes were stricken which required that the creditor seeking the provisional remedy initiate a suit, file an affidavit and post a double indemnity bond in favor of the debtor. These procedures were held inadequate to protect the debtor from arbitrary or mistaken seizure. In both cases the debtor could regain use of his property by posting either a single or double indemnity bond, but in each case the Court rejected this as a basis for upholding the statutes. "When officials . . . seize one piece of property from a person's possession and then agree to return it if he surrenders another, they deprive him of property whether or not he has the funds, the knowledge, and the time needed to take advantage of the recovery provision." Fuentes, 407 U.S. at 85, 92 S.Ct. at 1997.
 
 
 129
 The preseizure procedural safeguards present in Mitchell which satisfied due process and which distinguish it from the Florida and Pennsylvania replevin remedy and Georgia attachment statute which did not are: (1) the remedy was limited to goods in which a security interest had been retained, thus simplifying the issue of the creditor's right to repossess; (2) a judge rather than a clerk issued the writ; (3) the creditor was required to file an affidavit alleging specific facts based upon personal knowledge entitling it to possession, and (4) the creditor was required to prove its claim at an immediate postseizure hearing if the writ was not to be dissolved. Moreover, under the Louisiana statute, as with the stricken Florida and Georgia statutes, the creditor was required to file a complaint initiating an action for repossession and to post a double indemnity bond.
 
 
 130
 The Pennsylvania common law possessory lien challenged here stands in stark contrast to all of these statutory procedures the viable as well as the infirm. The repairman is empowered to deprive the owner of possession without filing suit for the amount in dispute, without filing an affidavit, and without posting a bond to indemnify the debtor in the event the basis for impounding the vehicle was wrongful. Unless the debtor posts a double indemnity bond to protect the repairman he cannot recover the vehicle until after he prosecutes a suit to final judgment. Not only does this law lack the "saving characteristics of the Louisiana statute," 419 U.S. at 607, 95 S.Ct. at 722, but it lacks even the rudimentary safeguards held insufficient in Fuentes and North Georgia Finishing. Because Pennsylvania's possessory lien law has deprived the owner of possession without providing a single protection against arbitrary or mistaken seizure, its unconstitutionality follows a fortiori from Supreme Court precedent.
 
 
 131
 The proffered distinctions between these precedents and the facts in this case are unpersuasive. The availability of a prejudgment procedure for return of the auto to the owner upon posting a double indemnity bond is not, as previously noted, a saving factor. Fuentes, 407 U.S. at 84-85, 92 S.Ct. 1983. Nor does the fact that the repairman's initial possession was consensual have any bearing on the validity of his wrongful detention long after his limited bailment has terminated.
 
 
 132
 It is hornbook law that the bailee must yield possession in accordance with the terms of the bailment contract, 8 C.J.S. Bailments § 37 (1962), and there was no contractual provision for retention of the vehicle as security here. Thus, the owner was deprived of property once the repairman's bailment terminated and he detained the vehicle on the strength of state law.
 
 
 133
 Moreover, Fuentes and its progeny cannot be distinguished by suggesting that the creditor's interest is stronger here. Unlike Mitchell, in which purchase money mortgages were involved, here the repairman's accretion value will often be a minor part of the chattel's value. As with the goods in Mitchell the vehicles are subject to destruction and waste, but in contrast to Mitchell the state can by virtue of its control over certificates of title devise procedures to protect a repairman from the risk of alienation of the vehicle without depriving the owner of possession. In short, if there is any difference between this case and the Court's precedent on this score, it is that the repairman's interest here is less and the owners' greater than those of the respective parties to a typical purchase money mortgage.
 
 
 134
 The error I find in the result reached by my brothers is apparent in the very real consequences which follow from the judgment upholding the possessory lien. In Fuentes the Court struck down a Pennsylvania procedure affording more protection to debtor-owners than does the retention lien here. As a result, Pennsylvania amended its court rules, modeling them on the Louisiana statute upheld in Mitchell. The hallmark of these rules is that the owner will not be deprived of his property unless the creditor files suit and posts bond, a judicial officer gives his sanction, and an opportunity is given for the owner to immediately regain possession without posting bond. Pa.R.Civ.P. 1073 et seq.
 
 
 135
 This court now says that those procedures need not apply when a repairman deprives an owner of possession. The supreme irony of this result is that the only legal recourse open to a dispossessed owner pending final judgment is to seek replevin in the shoes of a creditor under the same court rules designed to protect debtors from oppressive creditor tactics. The debtor-creditor world is turned upside down when the debtor-owner cannot regain his property without posting a double bond, filing suit and affording the creditor an early hearing procedures designed to prevent a debtor from wrongfully losing possession. The consumers who won procedural protection against arbitrary and mistaken seizure when the court rules were amended to comply with Fuentes and Mitchell have been hoisted with their own petard.
 
 
 
 [1]
 Pa.Stat.Ann. tit. 6, §§ 11-14 (1963) provide:
 § 11. Procedure for sale of personal property under common law lien
 Hereafter where any person, corporation, firm, or copartnership may have what is known as a "common law lien" for work done or material furnished about the repair of any personal property belonging to another person, corporation, firm, or copartnership, it shall be lawful for such person, corporation, firm, or copartnership having said common law lien, while such property is in the hands of the said person, corporation, firm, or copartnership contributing such work and material, to give notice in writing to the owner of the amount of indebtedness for which said common law lien is claimed for the labor and material that has entered into the repair, alteration, improvement, or otherwise, done upon the said property. If the said claim for said work or material is not paid within thirty days the said person, corporation, firm or copartnership to which said money is due, may proceed to sell the said property, as hereinafter provided: Provided, however, That the owner of said property, if he disputes said bill, may issue a writ of replevin, as provided by law, within the said thirty days, and the said dispute shall be settled in said action of replevin.
 § 12. Notice of sale
 The notice hereinbefore provided for shall contain an itemized statement setting forth the work and material furnished for the repair, alteration, or improvement of the said personal property, and shall be verified by oath of the claimant; and if said claim is not paid within said thirty days then the said claimant may sell the said property at public sale by giving ten days' notice thereof in the same manner as personal property is sold by sheriff or constable.
 § 13. Disposition of proceeds
 After satisfying the lien and any costs that may accrue, any residue remaining shall on demand, within six months, be paid to the owner of the property; and if such residue is not demanded within six months from the date of the sale, the same shall be deposited by the person making the sale with the treasurer of the county, together with a statement of the claim and the costs of enforcing the same, a copy of the published notice, and of the amounts received for the goods at said sale. Said residue shall by the county treasurer be credited to the general revenue fund of the county, subject to the right of the owner, or his personal representatives, to reclaim the same at any time within three years from the date of the deposit with the county treasurer.
 § 14. Title on sale
 All sales of property made under this act shall be as conclusive to the title conveyed as if sold by a sheriff or constable.
 
 
 [2]
 42 U.S.C. § 1983 (1974) provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [3]
 See Parks v. "Mr. Ford," 386 F.Supp. 1251, 1269 (E.D.Pa.1975)
 
 
 [4]
 The appeal was first heard by a panel of this Court. Prior to the filing of a panel opinion, the Court voted to consider the appeal in banc
 
 
 [5]
 The requirement of 42 U.S.C. § 1983 that the challenged actions be "under color of" state law has been treated as equivalent to the state action requirement of the Fourteenth Amendment. United States v. Price, 383 U.S. 787, 794-95 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); Magill v. Avonworth Baseball Conference, supra, at 1331 n. 5
 
 
 [6]
 Plaintiff Dillon's claim for injunctive relief against the sale of her car is discussed infra
 6a Since state courts did not participate in the action challenged in this case, it is obvious that this first category of state action cases is inapplicable. However, we believe that a few additional words of explanation are needed in light of the discussion in two of the concurring opinions.
 For state action purposes, it is important to distinguish between the following two types of cases which fall within the first category: 1. cases in which state courts enforced the right of private persons to take actions which are permitted but not compelled by law and 2. cases in which state courts enforced laws which require or forbid certain actions to be taken.
 In cases of the first type, state action has been found only when the doctrine of Shelley and Barrows has been found applicable, and that doctrine has been limited to cases involving racial discrimination. Concurring opinion of Hunter, J., at 162. See also Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 60, 1188 n. 21 (1969).
 In cases of the second type on the other hand, state action has been found routinely. Most of the Supreme Court cases cited in the critical portions of Judge Gibbons's concurring opinion fall into this group. In those cases, state laws mandated the very activity challenged, and the Supreme Court assumed the presence of state action without ever addressing that issue. Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (plaintiff sought injunctive and declaratory relief against enforcement of state law forbidding sale of 3.2% beer to males, but not to females, between ages of 18 and 21); Stanton v. Stanton, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975) (state court entered order refusing to award child support for 18 year old female, because age of majority under state law was 18 for females and 21 for males); Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (plaintiff sought injunctive and declaratory relief against enforcement of zoning ordinance restricting land use to homes occupied by not more than two unrelated persons); Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (state courts enforced state statute which, upon death of parent, preferred legitimate and acknowledged illegitimate children over unacknowledged illegitimate children in awarding workman's compensation); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (state court appointed father rather than mother administrator of intestate child's estate, since state law required that males be preferred over females of same degree of relationship to intestate); Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971) (state court, pursuant to state law, refused to afford illegitimate child same rights in intestacy as legitimate child); Glona v. Am. Guar. & Liab. Ins. Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968) (federal court in diversity suit dismissed action by mother to recover for wrongful death of illegitimate child, since state law barred such suits). Levy v. La., 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (state court dismissed action by illegitimate children to recover for wrongful death of mother, since state law barred such suits).
 6b Judge Gibbons's concurring opinion reads our decision in Braden far too broadly. Braden did not hold that "the University of Pittsburgh is actually an instrumentality of the Commonwealth" (Concurring Opinion of Gibbons, J., at 151) leading to state action. Braden held only that on the University's motion under Fed.R.Civ.Proc. 12(b)(6) "the district court did not commit error in declining to dismiss (Dr. Braden's) complaint for a purported want of state action." Braden v. Univ. of Pittsburgh, 552 F.2d 948 at 966 (3d Cir. 1977). Hence the question of state action in Braden is still completely open and undecided.
 
 
 [7]
 See also Norwood v. Harrison, 413 U.S. 455, 469-70, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); Adickes v. S. H. Kress & Co., 398 U.S. 144, 190, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1969) (Opinion of Brennan, J.); Weise v. Syracuse Univ., 522 F.2d 397, 405 (2d Cir. 1975); Greenya v. George Washington Univ., 167 U.S.App.D.C. 379, 512 F.2d 556, 560 (1975); Grafton v. Brooklyn Law School, 478 F.2d 1137, 1142 (2d Cir. 1973); Coleman v. Wagner College, 429 F.2d 1120, 1127 (2d Cir. 1970); Edwards v. Habib, 130 U.S.App.D.C. 126, 397 F.2d 687, 693 (1968)
 
 
 [8]
 Davis v. Richmond, supra, at 203. See also Burke and Reber, State Action, Congressional Power and Creditors' Rights: An Essay on the Fourteenth Amendment, 47 S.Cal.L.Rev. 1, 47 (1973)
 
 
 [9]
 Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 352, 95 S.Ct. at 454 (Emphasis added.) We also note that, in determining whether a particular activity has "traditionally" been the exclusive province of the state, or whether private individuals have also "traditionally" engaged in it, it makes no difference whether the rule of law which enables private citizens to engage in the activity was judge-made or statutory. Cf. Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (for purposes of federal question jurisdiction, "laws" include both common law and statutes)
 
 
 [10]
 See also Hudgens v. NLRB, 424 U.S. 507, 513-21, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972)
 10a Under the sweeping theory of state action expressed in Judge Gibbons's concurring opinion, virtually all human activity would be state action. Judge Gibbons relies upon the following two premises:
 Certainly lawmaking is 'significant involvement' in the activity governed by law.
 Concurring Opinion of Gibbons, J., at 151.
 . . . (A)ll human activity takes place within the framework of law . . . . Id. at 155.
 He therefore concludes that the state is significantly involved in all human activity and that all human activity is state action unless it falls into an "area within which collective society asserts no interest" and in which it leaves decisions to "private ordering." Concurring Opinion of Gibbons, J., at 155.
 This theory has three major flaws. First, it gives no instruction as to which conduct falls into areas reserved for "private ordering" and which does not. Second, it is fundamentally at odds with the state action analysis employed by the Supreme Court and by this Court. Both courts have stated frequently that the central question in state action cases without regard to the five categories sought to be created in Judge Gibbons's concurring opinion (id. at 151-152) is whether the state involvement in the challenged action is "significant". E. g. Gilmore v. City of Montgomery, 417 U.S. 556, 573, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974); Moose Lodge No. 107 v. Irvis, supra, 407 U.S. at 173, 92 S.Ct. 1965; Reitman v. Mulkey, supra, 387 U.S. at 380, 87 S.Ct. 1627; Hollenbaugh v. Carnegie Free Library, supra, at 383 ("polestar of our analysis"); Magill v. Avonworth Baseball Conference, supra, at 1332. Judge Gibbons's opinion, on the other hand, assumes that the state is significantly involved in all human activity. Finally, none of the cases cited in that opinion provides persuasive support for a theory of such breadth and such far-reaching results. With respect to the Supreme Court cases cited in parts IV E and V of that opinion, see note 6a supra. With respect to the cases involving challenges to laws similar to those at issue here, see note 11 supra. With respect to cases involving challenges to landlords' and hotelkeepers' lien laws, see Anastasia v. Cosmopolitan Nat'l. Bank, 527 F.2d 150 (7th Cir. 1975) (no state action); Davis v. Richmond, 512 F.2d 201 (1st Cir. 1975) (no state action). See also Culbertson v. Leland, 528 F.2d 426 (9th Cir. 1975) (state action because, inter alia, statute expanded common law rights and property seized is unrelated to the debt); Hall v. Garson, 430 F.2d 430, 439 (5th Cir. 1970) (state action because state delegated to landlords right traditionally reserved to sheriffs to enter another's home without consent).
 
 
 [11]
 We do not believe that there are any contrary cases which are persuasive. Adams v. Dept. of Motor Vehicles, 11 Cal.3d 146, 113 Cal.Rptr. 145, 520 P.2d 961 (1974), held that the retention and sale of a customer's vehicle by a private garageman pursuant to California law involved state action. However, Adams did not analyze the retention and sale provisions separately. It found that state action was present because 1. the lien was "created and governed by statute," 2. the sale provision represented a delegation of the "traditional government function of lien enforcement," and 3. state employees participated in the sale by sending notice to the car owner, by supplying the garagemen with literature describing proper sale procedures, and by transferring title after sale. Obviously, the last two of these factors concern only the sale provision. In addition, we believe, for the reasons expressed in text, that the first factor the mere fact that the lien was "created and governed" by state law is not, without more, sufficient to constitute state action
 Straley v. Gassaway Motor Co., Inc., 359 F.Supp. 902 (S.D.W.Va.1973), held that provisions of West Virginia law similar to those involved in Adams and those at issue here violate due process. However, Straley also failed to analyze the retention and sale provisions separately. In addition, Straley did not analyze the issue of state action.
 Several other cases which are sometimes cited in support of the proposition that garagemen's possessory liens involve state action actually concern only provisions authorizing the sale and not the mere retention, of vehicles. Hernandez v. European Auto Collision, Inc., 487 F.2d 378 (2d Cir. 1973), held that the New York law permitting a garageman to sell a retained vehicle violated due process. However, Hernandez did not reach the provision permitting the garageman to retain the vehicle. Id. at 386-87. Furthermore, Hernandez contained no discussion of the issue of state action. Cockerel v. Caldwell, 378 F.Supp. 491 (W.D.Ky.1974), upset the Kentucky law permitting the sale of a retained vehicle. Like Hernandez it also apparently did not reach the provision permitting retention. Id. at 496. And it treated the issue of state action in two sentences. Id. at 494. Similarly, Caesar v. Kiser, 387 F.Supp. 645 (M.D.N.C.1975), Mason v. Garris, 360 F.Supp. 420 (N.D.Ga.1973), and Whitmore v. N. J. Div. of Motor Vehicles, 137 N.J.Super. 492, 349 A.2d 560 (Ch. Div. 1975), invalidated state statutes authorizing the sale of retained vehicles, but they do not appear to have disturbed the garagemen's common law lien. More importantly, none of those cases contains any analysis of the question of state action.
 See also DeMarsh v. Landreth, 89 N.M. 494, 553 P.2d 1301 (1976), in which the Court of Appeals of New Mexico assumed without deciding that state action was present when a private garageman retained possession of a vehicle under the possessory lien sanctioned by state law. Since DeMarsh concluded that the lien did not violate due process standards, it did not find it necessary to decide the state action question.
 
 
 [12]
 Similar but by no means identical statutes were enacted by neighboring states during the same period. N.J.Stat.Ann. tit. 2A, §§ 44-29 to 44-31 (1952) was enacted in 1915. N.Y. Lien Law §§ 200-206, 208-09 (McKinney 1966) was enacted in 1909
 
 
 [13]
 An appellate court can affirm a correct decision of a lower court even when that decision is based on an inappropriate ground. Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937); PAAC v. Rizzo, 502 F.2d 306, 308 n. 1 (3d Cir. 1974)
 
 
 [14]
 Jonnet v. Dollar Savings Bank, supra, at 1126-27
 
 
 [15]
 Jonnet v. Dollar Savings Bank, supra, at 1126-27
 
 
 [16]
 North Georgia Finishing, Inc. v. Di-Chem, Inc., supra, 419 U.S. at 607, 95 S.Ct. 719
 
 
 [17]
 It may be assumed that most sales are precipitated by a disagreement over the amount to be charged for the repair work and that relatively minor sums are involved. A procedure which would provide for a pre-sale hearing before a small claims court or another state court of limited jurisdiction would appear to be adequate. Any prejudice to the garageman could be avoided by requiring that the customer post a bond or other security as a prerequisite to appeal from an adverse decision
 
 
 [1]
 Chief Judge Seitz, in his concurring and dissenting opinion, raises a number of provocative points in connection with the due process aspect of the procedure by which the owner of an automobile may regain the vehicle after a garageman's lien has been asserted. As Judge Gibbons points out in his opinion, the resolution of the due process problem in this type of situation requires a balancing of the interests that are implicated those of the garageman as well as those of the automobile owner. Since the necessary empirical data for a complete weighing of the interests has not been presented in this case, it would seem more appropriate to postpone a definitive interpretation of this important and perplexing problem until such material has been made available to the Court and fully considered. Such factors would include, for example, what might happen to automobile owners whose cars need repairs if the garageman does not obtain a lien. Will the garageman decline to render the needed service? Will it worsen the financial plight of the less affluent car owner? Will it result in demands for deposits before work proceeds? Will it result in written agreements before repairs are undertaken? The fact that the majority of the Court does not even address this point, makes caution here even more appropriate
 
 
 [2]
 See Braden v. University of Pittsburgh, 552 F.2d 948 at 956 (3d Cir. 1977); The Supreme Court, 1974 Term, 89 Harv.L.Rev. 17, 151 (1975)
 
 
 [3]
 Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352-53, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1975). See Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944)
 
 
 [4]
 See, e. g., Marsh v. Alabama, 326 U.S. 501, 507-08, 66 S.Ct. 276, 90 L.Ed. 265 (1946); id. at 501-511, 66 S.Ct. 276 (Frankfurter, J., concurring)
 
 
 [5]
 Judge Gibbons departs from this consensus by asserting that the public function cases are irrelevant in the present context. The basis for this conclusion is that the garagekeeper here "is acting on his own behalf, not for the public." Opinion of Gibbons, J., at 152
 In my view, however, there are three deficiencies in this proposition. First, it would appear that the suggested dichotomy between acting for oneself and acting for the public is a somewhat illusory one. The motivation for human conduct is not an all-or-nothing proposition. People often act based upon a complex combination of goals. Cf. Washington v. Davis, 426 U.S. 229, 253, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (Stevens, J., concurring). Moreover, in view of the increasing difficulty of maintaining a bright line between state and private action, a fact attested to by the diverse opinions in this very case, it is questionable whether the viability of this distinction could long be maintained.
 Second, even assuming that this is a serviceable distinction, I do not believe that it is consistent with the extant public function cases. In Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), for example, it would seem that the managers of the company town, were acting for their own benefit rather than that of the public in prohibiting the Jehovah's Witnesses from distributing pamphlets on the streets of the town. Yet, the Supreme Court found state action in that situation.
 Finally, the proposed explanation of the public function principle appears to misconstrue the essence of that doctrine. As I understand it, the fundamental question is not whether the purportedly private actor perceives himself as acting for the public. Rather, the inquiry is whether the type of activity in question is usually associated with the sovereign.
 
 
 [6]
 502 F.2d 1107 (3d Cir.), cert. denied sub nom. Gibbs v. Garver, 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974). In Gibbs, a panel of this Court held that self-help repossession of automobiles pursuant to a clause in a security agreement, as authorized by §§ 9-503 and 9-504 of the Uniform Commercial Code, did not constitute state action. Since it is a panel opinion, Gibbs would not ordinarily bind the Court en banc. In view of the Supreme Court's summary action in a case raising the same issues as Gibbs and reaching the same result, Benschoter v. First Nat'l Bank, 218 Kan. 144, 542 P.2d 1042 (1975), appeal dismissed for want of a substantial federal question, 425 U.S. 928, 96 S.Ct. 1656, 48 L.Ed.2d 170 (1976), however, the Gibbs holding would appear to be unassailable by this Court at this point. See Hicks v. Miranda, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975)
 As I shall indicate, see note 18 infra, my disagreement with the majority in this case does not mean that I take issue with the result reached in Gibbs.
 
 
 [7]
 As I read Judge Hunter's concurrence, it appears to be stating that although he disapproves of inquiries regarding lineage, at least in the general run of state action disputes, he believes that the lineage factor has a limited place in public function cases
 
 
 [8]
 512 F.2d 201 (1st Cir. 1975)
 
 
 [9]
 The circuits are divided on the question passed upon by the Davis Court. The Seventh Circuit concurs in the First Circuit's conclusion that a boardinghouse lien does not involve state action. Anastasia v. Cosmopolitan Nat'l Bank, 527 F.2d 150 (7th Cir. 1975). The Ninth and Fifth Circuits have decided that such a practice does constitute state action. See Culbertson v. Leland, 528 F.2d 426 (9th Cir. 1975); Hall v. Garson, 430 F.2d 430 (5th Cir. 1970)
 
 
 [10]
 See 512 F.2d at 204-05
 One other court of appeals has ruled on the question whether detention pursuant to a garageman's lien is state action. In Phillips v. Money, 503 F.2d 990 (7th Cir. 1974), the Seventh Circuit decided that state action was not present. The Phillips Court, however, did not analyze the public function issue.
 
 
 [11]
 The broader approach would seem to find support in the various White Primary Cases. See, e. g. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932). In those cases, the Supreme Court did not ask whether the specific activities in question were public functions. Rather, it inquired whether these activities were part of the electoral process, which is, of course, one of the attributes of sovereignty
 
 
 [12]
 This point is well illustrated by the many cases that have passed upon the constitutionality of the procedural aspects of creditors remedies. See, e. g. North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Jonnet v. Dollar Savings Bank, 530 F.2d 1123 (3d Cir. 1976). Certainly replevin and pre-judgment garnishment are procedures with origins that predate the fourteenth amendment. Yet this did not shield them from constitutional scrutiny. I do not believe that our inquiry should be different when we are asked to examine the state action aspect of a creditor's remedy as well as its procedural constitutionality. See Opinion of Gibbons, J., at 155
 
 
 [13]
 Cf. McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 415, 4 L.Ed. 579 (1819) (Marshall, C. J.) (The Constitution is "intended to endure for ages to come" and is "consequently, to be adapted to the various crises of human affairs.") (emphasis in original)
 
 
 [14]
 Judge Hunter seems to suggest that all conflict resolution would be state action if the state affirmatively chose to "arrogate to itself all modes of conflict resolution." Opinion of Hunter, J. at n. 1 (emphasis in the original). He concludes, however, that the mere possibility that this could happen is insufficient to transform into state action modes of conflict resolution that are currently in private hands
 The state action issue, as I see it, however, does not revolve about the possibility that the state, if it so chooses, could arrogate to its direct supervision all conflict resolving functions. As Judge Hunter aptly notes, such an analytical touchstone would make all conduct state action. What we must determine, however, is whether conflict resolution is so associated with the state that its exercise, whether done by a public official or a private citizen, must be attended by constitutional safeguards.
 
 
 [15]
 512 F.2d 201 (1st Cir. 1975)
 
 
 [16]
 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Moreover, it is significant that the Pennsylvania legislature has not remained wholly silent with respect to the repairmen's lien. Pa.Stat. Ann., tit. 6, § 11 explicitly recognizes the existence of such a lien, and the legislature has specified the procedures that must accompany its exercise
 
 
 [17]
 Such a course would appear to be appropriate, since the repairman, in essence, is alleging that the owner of the vehicle by reason of his refusal to pay is in breach of an express or an implied contract
 
 
 [18]
 The unilateral nature of the detention of the property that is before us, in my judgment, distinguishes this case from Gibbs v. Titelman and the other authorities dealing with the problem whether self-help repossession under Article 9 of the Uniform Commercial Code constitutes state action
 The self-help repossession cases, such as Gibbs, concerned situations where the creditor acted pursuant to a contractual right. Non-consensual conflict resolution, as I have sought to explain, is a function closely related to sovereignty and should thus be subject to constitutional restraint. Contractual agreements, however, have a different place in our society. Although contractual undertakings are made under a framework of state law, the substance of contracts is generally viewed as a private matter, and not as action of the state. This attitude is underscored by the constitutional proscription of laws which impair the obligation of contracts. U.S.Const., Art. I, § 10, cl. 1. Thus, in the absence of a close nexus between the state and the contract in question, it would seem that action taken pursuant to a contractual right is not state action. Cf. Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); Burton v. Wilmington Parking Auth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Braden v. University of Pittsburgh, 552 F.2d 948 (3d Cir. 1977).
 The distinction, for state action purposes, between acting pursuant to a contract and acting in a unilateral manner pursuant to a right granted by state law has been recognized by other federal courts. In Culbertson v. Leland, 528 F.2d 426, 429 (9th Cir. 1975), the Ninth Circuit invoked this reasoning in distinguishing its conclusion that detention pursuant to a landlord's lien was state action from its decision in Adams v. Southern Calif. Nat'l Bank, 492 F.2d 324 (9th Cir. 1973), cert. denied, 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974), which held that self-help repossession is not state action. See also James v. Pinnix, 495 F.2d 206 (5th Cir. 1974) (self-help repossession not state action; distinguishes Hall v. Garson, 430 F.2d 430 (5th Cir. 1970) where landlord's lien was declared to be state action). But see Culbertson v. Leland, 528 F.2d 426, 436 (9th Cir. 1975) (Choy, J., dissenting).
 
 
 [19]
 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)
 
 
 [20]
 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969)
 
 
 [21]
 See id. at 341, 89 S.Ct. 1820
 
 
 [22]
 Although I have concluded that due process has not been violated in this case, this should have no effect on the question whether due process standards should be imposed upon the exercise of common law liens. This is so because it is possible that in other circumstances the requisite procedures might not be afforded to debtors
 
 
 [23]
 Various suggestions for reform are presented in H. Friendly, Federal Jurisdiction: A General View, Ch. IV (1973)
 
 
 [1]
 The recent decision of this court on the nonretroactivity of Fuentes v. Shevin, supra is a singular example of such a viewpoint. See Kacher v. Pittsburgh Nat. Bank, 545 F.2d 842 (3d Cir. 1976)
 
 
 [2]
 Striking examples of the results of such a philosophy are Vorchheimer v. School Dist. of Philadelphia, 532 F.2d 880 (3d Cir.), cert. granted, 429 U.S. 893, 97 S.Ct. 252, 50 L.Ed.2d 176 (1976), and Linmark Associates, Inc. v. Township of Willingboro, 535 F.2d 786 (3d Cir.), cert. granted, 429 U.S. 938, 97 S.Ct. 351, 50 L.Ed.2d 307 (1976)
 
 
 [3]
 Majority Opinion at 140-141
 
 
 [4]
 Braden v. University of Pittsburgh et al., majority opinion at 958 & n. 46
 
 
 [5]
 Obviously, the state as principal must refrain from violating any of the citizens' constitutional rights, and the analysis is not limited to claims of racial discrimination. See pp. 152-155 infra
 
 
 [6]
 Majority Opinion at 135-136
 
 
 [7]
 E. g., Spark v. Catholic University of America, 167 U.S.App.D.C. 56, 510 F.2d 1277, 1281-82 (1975); Jackson v. Statler Foundation, 496 F.2d 623, 635 (2d Cir. 1974), cert. denied, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); Adams v. Southern California First National Bank, 492 F.2d 324, 333 (9th Cir.), cert. denied, 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974); Wahba v. New York University, 492 F.2d 96, 100-01 (2d Cir.) (Friendly, J.), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); Grafton v. Brooklyn Law School, 478 F.2d 1137 (2d Cir. 1974) (Friendly, J.). Cf. Anastasia v. Cosmopolitan Bank of Chicago, 527 F.2d 150, 155 (7th Cir. 1975), cert. denied, 424 U.S. 928, 96 S.Ct. 1143, 47 L.Ed.2d 338 (1976) (dictum); Greenya v. Washington University, 167 U.S.App.D.C. 379, 512 F.2d 556 (1975) (dictum); Fletcher v. Rhode Island Hospital Trust Nat'l Bank, 496 F.2d 927, 931 (1st Cir.), cert. denied, 419 U.S. 1001, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974) (dictum). But cf. Weise v. Syracuse University, 522 F.2d 397 (2d Cir. 1975) (Second Circuit, originator of the race/non-race distinction applies less stringent state action test in a non-race context); Adams v. Southern California First National Bank, supra, at 333 n. 23 ("This should not result in a hierarchy of rights")
 The hierarchical approach finds no support in any Supreme Court cases. Of course, as the dismemberment of the fourteenth amendment proceeds apace, Judge Friendly's position will gain adherence from civil libertarians seeking to prevent total victory by the states-rights activists. See Jackson v. Metropolitan Edison Co., 419 U.S. 345, 373-74, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (Marshall, J., dissenting).
 
 
 [8]
 Majority Opinion at 135. We note that Judge Hunter's thoughtful concurrence in this case manifests an awareness of the insufficiency of the majority's discussion of this issue. While we do not agree with Judge Hunter's conclusions, primarily because, for us, "race" is not a constitutional talisman, we fully agree with his identification of the issues
 
 
 [9]
 E.g., "In this case, it is clear that Pennsylvania recognized an artisan's lien on property he had repaired or improved long before 1868," Majority Opinion at 139; ". . . the garageman's power to sell property retained under his common law lien, unlike the lien itself, was not authorized prior to the enactment of the statute in 1925 . . . ." Id. at 141
 
 
 [10]
 The Kansas Supreme Court collected the relevant state and federal cases in Benschoter. See 218 Kan. at 147-148, 542 P.2d at 1046
 
 
 [11]
 The distinction between liens created by law and liens created by private contract permitted by law was recognized by the Ninth Circuit in Culbertson v. Leland, 528 F.2d 426, 429 (9th Cir. 1975), in distinguishing its holding in Adams v. Southern California State National Bank, 492 F.2d 324 (9th Cir. 1973), cert. denied, 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974), that contractual self-help repossession did not involve state action
 Candor requires the disclosure that the author of this opinion has always contended that Gibbs v. Titelman was incorrectly decided because of the necessary involvement of the Bureau of Motor Vehicles. Judge Hunter's concurring opinion in this case suggests that even the author of Gibbs v. Titelman is having second thoughts. We do not, however, have any reason to reexamine the Gibbs v. Titelman holding in this case.
 
 
 [1]
 The state probably could, if it so chose, arrogate to itself all modes of conflict resolution. So, too, might it be able to provide that all contracts, in order to be enforceable, must receive state approval; however, I should not think that the mere existence of this possibility would ipso facto transmute into state actions all the private contracts entered into under the existing common and statutory law
 
 
 [2]
 Moreover, it may be that the power to determine finally as opposed to temporarily the ownership rights in a chattel, because of the drastic consequences, is necessarily an attribute of sovereignty; perhaps only the state ought to be able to declare that a particular person within its jurisdiction has, under its law, lost all rights with respect to a chattel. Remission of such final and complete divestitures to private resolution by an interested party may amount to the abdication of one of the essential duties of any government the ultimate safeguarding of property. See generally T. Hobbes, Leviathan ch. 18, P 7 (1651); J. Locke, Concerning Civil Government, Second Essay ch. IX, PP 123-25, ch. XI, P 137 (1690); C. Montesquieu, The Spirit of Laws bk. VI, ch. 1 (1748); 2 F. Pollock & F. Maitland, The History of English Law 149-50 (2d ed. 1968). (The holding in Gibbs v. Titelman, 502 F.2d 1107 (3d Cir.), cert. denied sub nom. Gibbs v. Garver, 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974), did not reach the private party's power to sell a repossessed chattel; it dealt only with a temporary deprivation.) Fortunately, we need not in this case resolve the broader question about the status of any private sale as a public function, since sale following the rise of a possessory lien is clearly a traditional function of the sovereign
 
 
 [3]
 The historical origins of a particular right and its form of grant, together with the state of the law as of the passage of the fourteenth amendment, are not separate tests for state action. Rather, they are clues in the puzzle as to whether or not a given private activity is a delegated "public function," an attribute of sovereignty in our legal order